Andrew L. Morrison (AM-1071)
Sarah P. Kenney (SK-5642)
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
212-536-3900

Attorneys for Plaintiff
Cynthia McGrath, individually and as
Administratrix Ad Prosequendum of the Estate
of Megan Wright

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**07 CIV 11279**

------------------------------------------------------------------X

CYNTHIA McGRATH, INDIVIDUALLY AND AS
ADMINISTRATRIX AD PROSEQUENDUM OF THE
ESTATE OF MEGAN WRIGHT,

                Plaintiff,

      - against –

DOMINICAN COLLEGE OF BLAUVELT,
NEW YORK, SISTER MARY EILEEN O'BRIEN,
INDIVIDUALLY AND AS PRESIDENT OF
DOMINICAN COLLEGE, JOHN LENNON,
INDIVIDUALLY AND AS DIRECTOR OF
SECURITY OF DOMINICAN COLLEGE, JOHN
PRESCOTT, INDIVIDUALLY AND AS DEAN OF
STUDENTS OF DOMINICAN COLLEGE, CARLYLE
HICKS, INDIVIDUALLY AND AS DIRECTOR OF
RESIDENT LIFE OF DOMINICAN COLLEGE,
RICHARD FEGINS, JR., KENNETH A. THORNE, JR.,
ISAIAH LYNCH, and TERRELL E. HILL,

                Defendants.

------------------------------------------------------------------X

Civil Case No. **JUDGE ROBINSON**

:

:

:

:

:

**COMPLAINT**

:

:

Jury Trial Demanded

:

:

:

:

:

:

:

Plaintiff Cynthia McGrath, individually and as the Administratrix Ad Prosequendum of

the Estate of Megan Wright, by her attorneys, Kirkpatrick & Lockhart Preston Gates Ellis LLP,

for her Complaint against Dominican College of Blauvelt, New York ("Dominican College"),

Sister Mary Eileen O'Brien, individually and as President of Dominican College, John Lennon,

individually and as Director of Security of Dominican College, John Prescott , individually and

as Dean of Students of Dominican College, Carlyle Hicks, individually and as Director of

Resident Life of Dominican College, Richard Fegins, Jr., Kenneth A. Thorne, Jr., Isaiah Lynch,

and Terrell E. Hill, hereby alleges:

## PRELIMINARY STATEMENT

1.      This Complaint tells the tragic story of the death of Megan Wright, a promising

young woman who was the victim of a sexual assault on the Dominican College campus during

her freshman year of college.  After Megan Wright reported the attack to the appropriate officials

at Dominican College, the school refused to take her complaint seriously, to treat her with any

modicum of respect or to investigate the alleged attack in any meaningful way.  Dominican

College refused to provide reasonable accommodations to Megan Wright and even made her

take her final exams a few days after the attack.  Dominican College – contrary to its own

published rules and contrary to basic principles of human decency – then embarked on a course

of conduct designed to cover up the attack -- perpetrated by Dominican College students and

their guest.  Among other things, Dominican College steered the so-called "criminal"

investigation to a local police detective who was hopelessly conflicted as he was also employed

by the school.  Accordingly, no meaningful police work or investigation occurred.

2.      Over the summer, Megan Wright sought a meeting with the president of

Dominican College, but her request was refused.  Megan also sought to pursue an investigation

by school officials but, again, this did not happen.  Megan Wright requested permission to take

her final exams at a school closer to her home under the supervision of a proctor. Dominican College also refused this request.

3.    Scared to return to campus and faced with an uncaring administration, Megan Wright -- to her huge disappointment -- did not return to Dominican College for the fall semester.

4.    Megan Wright took her own life before the end of the calendar year.

5.    Dominican College had actual knowledge of at least one previous sexual assault on campus that occurred one month prior to the assault on Megan Wright, yet it did nothing to educate its students or increase campus security in its Residence Halls.

6.    After Megan Wright reported the assault on her to the school, it failed to investigate or take any remedial steps with respect to Megan Wright and/or campus security.

7.    The school was not merely negligent with respect to Megan Wright, but it also acted with deliberate indifference after the attack occurred.

8.    This Complaint seeks to hold Dominican College liable for its failure to protect Megan Wright, its callous disregard for the well-being of Megan Wright after the attack on her occurred and its deliberate refusal to respond in any meaningful way to the attack on Megan Wright.

9.    This Complaint also seeks to hold Megan Wright's attackers liable for their heinous conduct. As set forth below, these individuals knowingly conspired to assault and abuse Megan Wright and then executed their plan by steering Megan away from her room and into another room knowing that Megan Wright was incapable of consenting to sex with three individuals at one time with a hallway full of spectators outside the room.

**The Parties**

10.     Plaintiff Cynthia McGrath is the mother of Megan Wright and on February 15, 2007 she was appointed Administratrix Ad Prosequendum for Megan Wright's estate. Ms. McGrath resides at 804 DeSimone Court, Ramsey, New Jersey 07446.

11.     The plaintiff's decedent, Megan Wright, enrolled as a freshman at Dominican College for the 2005/2006 school year  Megan lived on campus during her freshman year. She was 20 years old when she took her own life.

12.     Defendant Dominican College is a private institution of learning that receives federal funding and is located in Orangeburg, New York.

13.     Defendant Sister Mary Eileen O'Brien ("O'Brien") at all times relevant to this lawsuit was the President of Dominican College, with a principal place of business at 470 Western Highway, Orangeburg, New York.

14.     Defendant John Lennon ("Lennon") at all times relevant to this lawsuit was the Director of Security of Dominican College, with a principal place of business at 470 Western Highway, Orangeburg, New York.

15.     Defendant John Prescott ("Prescott") at all times relevant to this lawsuit was the Dean of Students of Dominican College, with a principal place of business at 470 Western Highway, Orangeburg, New York.

16.     Upon information and belief, Defendant Carlyle Hicks ("Hicks") at all times relevant to this lawsuit was the Director of Resident Life for Dominican College, with a principal place of business at 470 Western Highway, Orangeburg, New York.

17.     Defendant Richard Fegins, Jr. ("Fegins") at all times relevant to this lawsuit was a student of Dominican College; Fegins resides at 816 E. Blancke St., Linden, New Jersey.

4

18.    Upon information and belief, defendant Kenneth A. Thorne, Jr. ("Thorne") at all times relevant to this lawsuit was a student of Western Michigan University; Thorne resides at 34 Hasting Ln., Willingboro, New Jersey.

19.    Defendant Isaiah Lynch ("Lynch") at all times relevant to this lawsuit was a student of Dominican College; Lynch resides at 811 Hussa St., Linden, New Jersey.

20.    Defendant Terrell E. Hill ("Hill"), at all times relevant to this lawsuit was a student of Dominican College; Hill resides at 32 Halgren Cres., Haverstraw, New York.

**Venue and Jurisdiction**

21.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction) and the doctrines of ancillary and pendent jurisdiction.

22.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the defendant Dominican College is located in this judicial district and a substantial part of the events which give rise to the claims herein occurred in this district.

## FACTS COMMON TO ALL CAUSES OF ACTION

### *Dominican's Code of Conduct and Security Policies*

23.    Megan Wright matriculated as a full-time freshman student at Dominican College in late August 2005.

24.    Before moving to her room located in one of the campus residence halls, Megan Wright and Dominican College entered into a "Housing Contract" on or about July 11, 2005.

25.    The Housing Contract provides that "Residents are prohibited from engaging in conduct in or about the residence facility which poses a threat to the health or safety of persons

or property, which interferes with the rights or well being of others, or which violates any

provision of this Agreement, or any rule/regulation of the College or any applicable law."

26.    The Housing Contract also provides that "Residents shall be responsible for the

conduct of their guests or visitors . . . who must also respect and comply with all

rules/regulations while in or about the Residence Hall."

27.    The Housing Contract also prohibits the use of alcohol and drugs in the Residence

Hall.

28.    The Housing Contract also states that "Dominican College recognizes that

freshmen are faced with a period of transition to college residential living.  In order to facilitate a

successful transition, a freshman guest and visitation policy has been implemented."

29.    The Housing Contract provides that Dominican College "will use reasonable

efforts to enforce such rules/regulations," that are established by the school for residential living

on campus.

30.    The Housing Contract purports to disclaim liability for failure to enforce its rules

and regulations "provided it has acted in good faith."

31.    Megan Wright was assigned to live on campus in a Residence Hall known as

Hertel Hall.

32.    Upon arrival, Megan Wright received various publications from Dominican

College that warned her of the various security risks posed by living on campus and that advised

her of the security precautions taken by Dominican College.

33.    Among the documents received by Megan Wright was Dominican College's Code

of Conduct for its students (the "Code of Conduct").

34.     The Housing Contract between Megan Wright and Dominican College explicitly incorporated by reference the terms of the Code of Conduct.

35.     The Code of Conduct acknowledged Dominican College's "obligation" to "protect" its students and specifically states that Dominican College "**accepts its obligation to provide for its members an atmosphere that protects and promotes its educational mission and which guarantees its orderly and effective operation.**" [emphasis added]

36.     The Code of Conduct also states:

> No student or employee shall sell, possess or consume alcoholic beverages on college property . . . without the appropriate prior written approval.

37.     The Code of Conduct also states:

> Students are responsible for the behavior of their guests and must ensure that guests comply with Dominican College regulations, including the standards in this Code of Conduct. Students in residence halls are responsible for abiding by the Rules for Hosting Visitors in the Residence Halls.

38.     The Code of Conduct also states:

> Residence hall residents are responsible for the behavior of their guests and for ensuring that guests comply with all Dominican College regulations.

39.     The Code of Conduct also states:

> The College **will not tolerate sexual assault. Sexual assault occurs when a person is physically forced, is coerced, drugged, or is physically or mentally unable to give consent; and assault may be committed by an acquaintance or a stranger**. [emphasis added]

40.     The Code of Conduct also states:

> Dominican College **does not recognize a victim's signed consent, waiver, or release as an absolute defense to a claim of sexual assault**. [emphasis added]

7

41.    In addition, the Security Policies published by Dominican College state:

Security and public safety patrols will be present at the Residence
Halls 24 hours a day.

42.    The Security Policies also state:

Once an incident of sexual assault, or sexual violations of any
kind, has been reported to the Vice-President and Dean of Students
an investigation will ensue.

43.    Dominican College's Student Handbook (the "Handbook") has specific

procedures for responding to victims of sexual assault.  In fact, the Handbook stresses that

victims should be treated with dignity and care.

44.    The Handbook specifically states:

If you have a friend who has been raped help her by doing the
following things:

- Believe her and don't blame her.

- Listen to her:  Let her tell her story, crying is normal.

- Support her:  Be a witness for what she is feeling and
saying without passing judgment . . . .

- Encourage the victim to get help from a trained trauma
counselor.

- Help her to regain control of her life as quickly as possible.
Start with little things - what she wants to eat or wear.
Then move on to more important decisions such as whether
to prosecute or not.

- Don't tell her to forget;  Let her work through this trauma
the best way she knows how.  There are no short cuts to
recovery.

45.    As demonstrated by its own written publications, Dominican College was aware

that sexual assault could occur on campus and that its effects would be traumatic to the victim.

46.    The school's published statements to the students acknowledged that the school accepted its obligation to keep the campus safe and provided conduct guidelines to assist students with reporting and coping with such incidents. In fact, Dominican College installed security cameras in Hertel Hall to record a video of activity on each floor. Upon information and belief, Dominican College's security personnel failed to monitor the cameras that record activity on, inter alia, the residential floors of Hertel Hall, and to monitor and regulate the people who enter that Residence Hall.

47.    Dominican College's written publications demonstrated its knowledge that a person may be unable to consent to sexual activity due to coercion, drugs or other physical and mental impairments. Dominican College's own written publications demonstrated its knowledge that the issue of consent cannot be determined dispositively by a signed writing.

48.    Ignoring its own written publications, agreements, and procedures, Dominican College acted with deliberate indifference to Megan Wright's complaint.

### Dominican College's Knowledge of a Reported Prior Sexual Assault

49.    In April 2006, just one month prior to the attack on Megan Wright, another female student was sexually assaulted in a Dominican College campus Residence Hall.

50.    Dominican College failed to investigate the April 2006 assault. The school's only response was to hold a non-mandatory student meeting that lasted no more than five minutes.

51.    In addition, Dominican College steered the victim of that assault to the same Orangetown police detective who handled Megan Wright's complaint. As set forth below, this detective was severely conflicted due to his relationship with Dominican College and he did not pursue either investigation.

52.     Dominican College failed to modify its security procedures in its Residence Halls as a result of the April 2006 assault.

53.     Dominican College failed to disclose the report of the April 2006 assault in violation of federal law, including the Clery Act, 20 U.S.C. § 1092.

### *Megan Wright's Sexual Assault*

54.     Less than one month after the April 2006 assault, another assault occurred in a Residence Hall maintained on Dominican College's campus.

55.     On or about May 7, 2006, Megan Wright was raped by defendants Richard Fegins, Jr., Isaiah Lynch, and Kenneth A. Thorne, Jr. in a Dominican College Residence Hall. At that time, defendants Fegins and Lynch were students at the school and defendant Thorne was a guest.

56.     The attack occurred after a late night party in Megan Wright's campus Residence Hall during which students were openly consuming alcoholic beverages in violation of school policy.

57.     Upon leaving the party, Megan Wright returned to her room. Before she could open the door to her room, defendants Terrell E. Hill and Kenneth A. Thorne, Jr. (who had followed Megan Wright from the party to her room) physically turned Megan Wright around, and brought her to another room.

58.     Defendant Thorne lead Megan into the second room and raped her.

59.     Shortly thereafter, defendants Fegins and Lynch appeared and defendant Thorne allowed them access to the room.

60.     Upon entering the room, Fegins and Lynch each raped Megan Wright.

61.    Throughout the assault on Megan Wright, several male students, including defendant Hill, congregated outside the room where the assault was occurring.  Upon information and belief, defendant Hill entered the room while the attack was occurring.  Several students were peeking into the room when the door opened for the attackers' ingress and egress and were "high fiving" one another at various times during the assault.  Some of the students even attempted to enter the room, but they were unable to gain access.

62.    While Megan Wright was still in the room, one of the assailants exited the room and held up a white sign, which purportedly contained Megan Wright's signature, to the surveillance cameras so that the camera could pick up the words printed on the sign above the signature:  "I WANT To HAVE SEX".

63.    Immediately after the attack, Megan Wright met with one of the school's resident advisors (the "Resident Advisor") —a representative of Dominican College—in Hertel Hall because she could not find the key to her room.

64.    The Resident Advisor helped Megan into her room.

65.    Although the Resident Advisor saw Megan Wright immediately after the attack and observed her disoriented state of mind, the Resident Advisor never reported the incident.

66.    Megan Wright awoke the next morning, May 8, 2006, believing that something was wrong.  She had a vague recollection of the events of the previous evening; she noticed that she was wearing different clothes and was sore and bleeding in the vaginal area.

67.    Megan Wright asked a friend to take her to White Plains Hospital for purposes of having a rape kit and SANE examination performed.[1]

---

[1]    "SANE" is the abbreviation for Sexual Assault Nurse Examiner Program, which provides direct patient care to victims of sexual assault. Participants of SANE deliver coordinated,

68.    The examination confirmed that substantial injuries, including bruising and lacerations, indicated forced rape.

69.    The SANE nurse on duty that day, in fifteen years of practice, has rarely seen a victim evincing more physical trauma than Megan Wright.

### Dominican College Fails to Respond to
### Megan Wright's Complaint In Any Meaningful Way

70.    Megan Wright promptly informed Dominican College of the sexual assault that occurred on May 7, 2006.

71.    Dominican College's Dean of Students, defendant Prescott, referred Megan to the Orangetown police department, but failed to mention to her that there were other campus procedures for filing complaints.  Defendant Prescott did not offer any further assistance to Megan aside from suggesting that she obtain counseling from the school's therapist.

72.    In fact, no accommodations were made for Megan Wright.  The school did not reassign her room in the Residence Halls.  The school even denied Megan's requests to take her final exams at a different location using exam proctors.

73.    Despite her attempts to do so, Megan Wright was unable to take her final exams. The school therapist was aware of this inability.

74.    Megan repeatedly sought assistance from the school only to be told that the school would neither take any action nor conduct its own independent investigation until the conclusion of the criminal investigation undertaken by the Orangetown police department.

75.    It took over a month from the date of the attack for defendant Prescott to view the security videotape taken from the Residence Hall.  This tape showed Megan being followed into

expert forensic and medical care necessary to increase successful prosecution of sex offenders and to assure essential medical intervention to victims of assault.

a Residence Hall room, the entrance into that room by her three alleged assailants, and the presence of another group of men gathered outside the door of that room.

76.    Megan Wright and her mother, Ms. McGrath, met with the Dean of Students in June and were told that Megan's complaint would be "difficult to prove." The Dean discouraged Megan from pursuing a complaint through the school.

### The Criminal Investigation Was Severely Compromised Due to Conflict of Interest

77.    Dominican College never conducted its own investigation of the attack.

78.    Dominican College directed Megan to pursue the criminal investigation with a detective in the Orangetown police department who, unbeknownst to Megan at the time, was employed by Dominican College as an instructor.

79.    Upon information and belief, Dominican College had also steered the victim of the April 2006 assault to that same detective who was employed by Dominican College as an instructor.

80.    Megan met with the detective on or about May 15, 2006, after her final exams period. The detective greeted Megan by saying, "Oh, you must be my Megan." Megan gave the detective the underwear and other articles of clothing that she had worn during the night of the rape; those items included samples of her blood. The detective interviewed Megan alone for approximately 20 minutes.

81.    Although the detective promised to report the results of a preliminary investigation within 10 days, neither Megan nor Ms. McGrath heard from the detective over the following few weeks.

82.    During its alleged "investigation", the Police Department did not investigate the room where Megan Wright alleged she was attacked. When asked why the Police Department

did not investigate the room, the detective told Ms. McGrath that "they only do that on TV".
The Police Department did not treat that room as a crime scene. Nor did they gather any
evidence from that room. In fact, no one from the Orangetown police department visited that
room in connection with any investigation of Megan Wright's allegations.

83.    The detective failed to contact either Megan Wright or Ms. McGrath for weeks
during the summer of 2006. Concerned by this sustained period of silence, Ms. McGrath called
the detective. During that call, the detective asked to meet with Megan Wright and Ms.
McGrath. When they later met, the detective viewed with Megan and her mother the
surveillance videotape taken from the Residence Hall on the night of the attack.

84.    The detective at that time indicated that he was aware of another reported sexual
assault that occurred on campus in April 2006.

85.    The detective was aware of the April 2006 assault because, upon information and
belief, the school had steered the victim of that assault to him.

86.    The detective took a writing sample from Megan by asking her to write on a
similarly sized piece of paper the words: "I WANT To HAVE SEX." The detective retained
this sample from Megan. In his police report, the detective later indicated that his refusal to
investigate the assault was due, at least in part, to the fact that he believed that Megan Wright's
handwriting matched the writing on that sign.

87.    The school adopted this reasoning by adopting the Police Department's so-called
investigation as its own.

88.    In October 2006, a detective from the District Attorney's office visited the
McGrath residence in Ramsey, New Jersey to question Megan.

89.     Shortly thereafter, a detective in the District Attorney's office advised Megan Wright and Ms. McGrath that Megan's case was a difficult case to prosecute because Megan's physical trauma did not make her unrecognizable and there were no eye witnesses to Megan's attack. She further advised that, although the detectives believed in her, the alleged assailants had retained attorneys who would not permit the alleged assailants to be interviewed by the District Attorney's office.

90.     One of the alleged assailants had -- on his own volition -- visited the office of the Orangetown police department to claim that he had consensual sex with Megan and indicated that Megan had printed the sign "I WANT To HAVE SEX" and signed it prior to the assault. The detective indicated that no separate interview of any other witnesses had been conducted to her knowledge.

91.     At this time, Ms. McGrath contacted the Orangetown police detective to inquire whether he had any additional information. Notwithstanding Ms. McGrath's instructions that the detective contact her directly and not speak with Megan Wright in her fragile state, the detective deliberately ignored Ms. McGrath and called Megan Wright. During this call, the detective told Megan Wright that he would not be pursuing the investigation. He also disclosed to Megan Wright, for the first time, that he was employed as an instructor at Dominican College at the time of the incident and during the entire period of the subsequent investigation.

### Dominican College Refuses to Pursue the Matter

92.     In June 2006, Ms. McGrath and Megan Wright met with the Dean of Students at Dominican College. At that time, the Dean indicated that the police investigation was proceeding but no independent school investigation had occurred. The Dean conceded that he still had not viewed the hallway videotape and that he had not conducted any interviews with the

alleged assailants. He indicated that he was awaiting additional information from the detectives at the Orangetown police department.

93.    In a subsequent meeting with the Dean of Students held during the summer of 2006, the Dean indicated that he had viewed the videotape and that, in his assessment, this would be a very difficult case to prove. Ms. McGrath asked if the alleged assailants would be suspended from school. The Dean indicated that there would be no such suspensions. Ms. McGrath informed the Dean that Megan would have to withdraw from school due to fear for her safety.

94.    After the meeting with the Dean of Students, Ms. McGrath and Megan Wright requested a meeting with the President of Dominican College, Sister Mary Eileen O'Brien. Sister O'Brien refused to meet with either Ms. McGrath or Megan Wright.

95.    Dominican College never communicated either a written or verbal report of any investigation to either Ms. McGrath or Megan Wright.

96.    Megan Wright and her mother told the Dean of Students that Megan was fearful of another attack if she returned to school. The school offered no accommodation.

97.    Megan Wright did not return to campus for the fall semester of the 2006/2007 school year.

98.    The sign relied upon by Dominican College to justify its refusal to investigate Megan Wright's complaint could not, on its own, demonstrate Megan Wright's consent. Yet, the Orangetown police department and Dominican College refused to investigate because they believed that Megan Wright's signature on the sign was authentic.

99.     Dominican College, looking for a quick way to end the affair, relied upon the slender reed of apparent written consent to justify its failure to investigate. Dominican College's strategy was an abdication of its legal obligations, moral principles and common sense.

100.     Dominican College's own Code of Conduct plainly states that written consent is not dispositive of the issue of consent with respect to a sexual attack. This sensible policy takes into account that a student may lose the ability to give consent due to voluntary or involuntary inebriation or drug use notwithstanding that the student may have retained the ability to sign her name. Dominican College's policy is clearly set forth in writing: "Dominican College **does not recognize a victim's signed consent, waiver, or release as an absolute defense to a claim of sexual assault**." [emphasis added]

101.     Yet, Dominican College refused to investigate Megan Wright's complaint because of a sign that, according to Dominican College and the Orangetown police detective employed by Dominican College, purported to give three different males consent to have sex with Megan Wright on the same evening, in the same room, and, literally, at the same time -- before a crowd of spectators.

102.     Dominican College, presented with (1) a victim who claimed a vague memory of the events that transpired and who manifested dramatic physical evidence of forced sexual intercourse; (2) evidence of consumption of alcohol during the party that led up to the attack; (3) a videotape that showed a group of males lingering outside the room where Megan Wright was raped, high fiving and celebrating as three individuals took their turn entering and exiting a bedroom where Megan Wright remained; and (4) a male holding up a sign to the security camera in an effort to demonstrate that there was consent, chose to ignore its own Code of Conduct and

conclude there was no issue as to Megan Wright's consent and, therefore, refused to investigate her accusations.

103.    Dominican College has failed to disclose to the Department of Education either Megan Wright's reported attack or the reported attack that occurred on campus in April 2006, as required by federal law.

104.    Megan Wright took her own life in December 2006 in her own bedroom with her mother and brother in the house.

### FIRST CAUSE OF ACTION

*(Violation of Title IX against defendant Dominican College)*

105.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 104 of this Complaint as if more fully stated herein.

106.    Dominican College's acts and failure to act with respect to Megan Wright's allegations of sexual assault occurring on the school's campus by two male Dominican College students and their male guest deprived Megan Wright of her rights on the basis of her female gender.

107.    Dominican College and its officials and officers had actual and/or constructive knowledge and/or notice of the attack on Megan Wright and prior attacks on other female students.  These officials had the remedial authority to address this type of conduct.

108.    Dominican College and its officials and officers responded to Megan Wright's complaint by failing to act and/or acting with deliberate indifference or in a manner clearly unreasonable in light of the known circumstances.

109.    Dominican College failed to investigate Megan Wright's reported sexual assault in any meaningful way.

110.    Dominican College failed to act promptly and equitably in response to Megan Wright's reported sexual assault.

111.    Dominican College took no steps to provide academic support or to otherwise accommodate Megan Wright after she reported the attack.

112.    Dominican College's failure to act resulted in Megan Wright leaving school, thereby exacerbating her impaired mental state arising from the attack and effectively denying her access to the educational benefits and opportunity from either Dominican College or from any other college or university.

113.    Dominican College's response to Megan Wright's complaint of sexual assault was not reasonably calculated to end the discriminatory conduct faced by Megan Wright.

114.    Dominican College failed to restore Megan Wright to her pre-deprivation status.

115.    The sexual assault committed upon Megan Wright occurred in a Residence Hall operated by Dominican College and subject to security personnel and guidelines of Dominican College.

116.    The attack on Megan Wright involved conduct so severe and objectively offensive that it deprived Megan Wright of her educational access and benefits.

117.    Dominican College receives federal funds.

118.    Dominican College's policies and procedures for reporting sexual harassment and sexual assault, as described in the annual Student Handbook, Code of Conduct "Disciplinary Proceedings" and Sexual Harassment Reporting Procedures, are inadequate.

119.    In addition, Dominican College failed to follow its own published guidelines.

120.    Dominican College's procedures failed to meet the requirements of Title IX. These failures include, but are not limited to:

- Failure to list the Title IX coordinator's name, title, location and telephone number/e-mail address.

- Failure to provide adequate timelines for the prompt investigation and resolution of complaints.

- Failure to ensure that findings will be reached regarding complaints filed.

- Failure to define which sanctions are available through various Dominican College procedures, how they may overlap, and under what circumstances they may be implemented.

- Failure to identify who is responsible for investigating complaints.

- Failure to define the complainant's option of filing with the Office of Civil Rights.

121.    Dominican College relied solely on the investigation of the Orangetown police and their conclusions with respect to the sign purportedly signed by Megan Wright instead of fulfilling its legal duty to investigate and independently verify Megan Wright's complaint and any defenses, such as consent.

122.    In addition, Dominican College's procedures place the burden on the complainant to initiate all the relevant procedures to resolve fully a complaint of sexual abuse.  The requirement of Title IX that procedures be equitable is to ensure that the reporting process is not dependent upon a complainant's inner fortitude and tenacity.

123.    Dominican College's procedures are on their face, and in their application, inequitable because they are not enforced uniformly and are not easy to follow, thus functioning as a barrier to complaints.

124.    Megan Wright was systematically denied the means to achieve a prompt and equitable resolution of her complaint, including her right to a thorough and objective investigation.

125.    Dominican College has fostered and perpetuated a hostile education environment on the basis of sex on its campus in violation of Title IX and its implementing regulations.

## SECOND CAUSE OF ACTION

### *(Premises Liability against defendant Dominican College)*

126.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 125 of this Complaint as if more fully set forth below.

127.    Dominican College, as landowner, owed a duty to Megan Wright both as a tenant living on its campus and as a student business invitee.

128.    Dominican College's duty to Megan included the duty to use reasonable care to keep the premises safe and to warn and protect Megan from foreseeable dangers.

129.    The risk of sexual assault in the Residence Halls was foreseeable as shown in Dominican College's own student guidelines and other publications.

130.    Recent attacks prior to Megan's attack gave Dominican College notice of the danger and imposed upon Dominican College a duty to protect its tenants, including Megan Wright.

131.    Dominican College explicitly and in writing acknowledged and accepted its duty to protect Megan and to ensure a safe learning and living environment for her.

132.    Dominican College and defendants O'Brien, Lennon, Prescott and Hicks failed to enforce the school's security policies and otherwise failed to take reasonable precautions to protect its tenants and business invitees, including Megan Wright.

133.    As a result of Dominican College's failures, Megan Wright was injured both physically and psychologically.

### THIRD CAUSE OF ACTION

*(Negligence against defendants Dominican College, O'Brien, Lennon, Prescott and Hicks)*

134.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 133 of this Complaint as if more fully set forth below.

135.    Dominican College acknowledged and accepted in writing its duty to protect its students, including Megan Wright, and to provide a safe environment for them.

136.    Dominican College's own publications acknowledge that sexual assaults within its Residence Halls were a foreseeable occurrence.

137.    Dominican College was on notice that at least one reported sexual attack occurred in its Residence Halls only one month prior to the attack on Megan Wright.  Despite this awareness, the school did nothing to increase its security procedures to prevent additional attacks from occurring.

138.    Dominican College's own publications acknowledge that a student may be unable to consent to sexual conduct due to coercion or voluntary or involuntary alcohol or drug use.

139.    Dominican College and defendants O'Brien, Lennon, Prescott, and Hicks failed to enforce the school's guidelines and procedures with respect to its own Residence Hall security, alcohol and guest policies, failed to take reasonable precautions to safeguard its students, and failed to follow the school's guidelines with respect to responding to reported sexual attacks occurring on campus.

140.    Dominican College's lax enforcement of its alcohol policy created an environment in which alcohol-induced misconduct was manifestly foreseeable.

141.    Sexual assault is a widely acknowledged risk of unchecked alcohol consumption occurring on a college campus.

142.    Dominican College and defendants O'Brien, Lennon, Prescott, and Hicks's failures to perform breached their duty to Dominican College's students, including Megan Wright.

143.    Dominican College and defendants O'Brien, Lennon, Prescott, and Hicks's failures proximately caused severe physical and psychological injuries to Megan Wright.

144.    The wrongful and negligent acts committed by Dominican College and defendants O'Brien, Lennon, Prescott, and Hicks resulted in Megan Wright's permanent departure from Dominican College and her persistent pain and suffering that arose from the fear, guilt, anxiety and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest disregard of the duties it owed to her.

145.    Megan Wright endured over seven months of pain and suffering following the attack, which was caused by Dominican College's blatant indifference towards her and towards its obligations both prior to and after the attack occurred.

146.    The pain and suffering experienced by Megan Wright continued until she took her own life in December of 2006.

147.    By reason of the above, Megan Wright was subjected to conscious pain and suffering caused by Dominican College from the day she reported the attack to the school in May 2006 until her death in December 2006.

## **FOURTH CAUSE OF ACTION**

### *(Breach of Contract against defendant Dominican College)*

148.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 147 of this Complaint as if more fully set forth below.

149.    Megan Wright and Dominican College entered into several agreements with respect to her enrollment as a student at the school and her residence on campus in one of the school's Residence Halls.

150.    Dominican College's published Code of Conduct was incorporated by reference into the Housing Contract entered into between Dominican College and Megan Wright on or about July 11, 2005.

151.    The Code of Conduct provided that Dominican College "accepts its obligation to provide for its members an atmosphere that protects and promotes its educational mission and which guarantees its orderly and effective operation."

152.    The Housing Contract also provides that "Residents are prohibited from engaging in conduct in or about the residence facility which poses a threat to the health or safety of persons or property, which interferes with the rights or well being of others, or which violates any provision of this Agreement, or any rule/regulation of the College or any applicable law."

153.    The Housing Contract also provides that "[r]esidents shall be responsible for the conduct of their guests or visitors . . . who must also respect and comply with all rules/regulations while in or about the Residence Hall."

154.    The Housing Contract also prohibits the use of alcohol and drugs in the Residence Hall.

155.    The Housing Contract also states that "Dominican college recognizes that freshmen are faced with a period of transition to college residential living. In order to facilitate a successful transition, a freshman guest and visitation policy has been implemented."

156.    The Housing Contract provides that Dominican College "will use reasonable efforts to enforce such rules/regulations" that are established by the school for residential living on campus.

157.    The Housing Contract purports to disclaim liability for failure to enforce its rules and regulations "provided it has acted in good faith."

158.    Dominican College failed to honor its obligation to provide an atmosphere that protected and promoted Megan Wright.

159.    Dominican College failed to enforce its rules and regulations with respect to the conduct of students and guests in the Residence Hall notwithstanding its knowledge of previous sexual violence recently reported on campus.

160.    To the extent that Dominican College's disclaimer of liability is enforceable, it does not apply because Dominican College acted in bad faith by its failure to enforce security regulations in the Residence Hall notwithstanding its knowledge of recent reported sexual attacks on campus.

161.    Accordingly, Dominican College breached its obligations under its pertinent agreements with Megan Wright.

## FIFTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress against defendants Dominican College, O'Brien, Lennon, Prescott and Hicks)

162.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 161 of this Complaint as if more fully set forth below.

163.    Dominican College's response to Megan Wright's complaint was insensitive and humiliating. Dominican College purportedly relied upon Megan Wright's signature under the words "I WANT TO HAVE SEX" and concluded -- without any investigation -- that Megan

consented to have sex with three different individuals, at the same time, before a crowd. This conclusion flies in the face of reason and logic and is contrary to Dominican College's own published Code of Conduct.

164.    Dominican College and defendants O'Brien, Lennon, Prescott, and Hicks refused to accommodate Megan Wright with respect to her final exams, refused to accommodate Megan Wright with respect to her concerns for her safety, refused to conduct an investigation of Megan Wright's complaint and coerced Megan into dropping her complaint and leaving school.

165.    Dominican College's reaction to Megan Wright's complaint and reliance upon the sign implied that Megan "asked for it."

166.    Dominican College and defendants O'Brien, Lennon, Prescott, and Hicks's outrageous conduct was sufficiently insensitive as to intentionally cause Megan Wright severe emotional distress.

167.    As a result, Megan Wright was psychologically damaged to the point that she took her own life.

168.    The wrongful and intentional acts committed by defendant Dominican College and defendants O'Brien, Lennon, Prescott, and Hicks resulted in Megan Wright's permanent departure from Dominican College and her subsequent persistent pain and suffering which arose from the fear, guilt, anxiety and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest disregard of the duties it owed to her.

169.    Megan Wright endured over seven months of pain and suffering following the attack.

170.    The pain and suffering experienced by Megan Wright continued until she took her own life in December of 2006.

171.    By reason of the above, Megan Wright was subjected to conscious pain and suffering caused by Dominican College from the day she reported the attack to Dominican College in May 2006, until her death in December 2006.

## SIXTH CAUSE OF ACTION

### *(Fraud against defendants Dominican College, O'Brien, Lennon, Prescott and Hicks)*

172.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 171 of this Complaint as if more fully set forth below.

173.    The Clery Act imposes upon Dominican College an obligation to disclose any reported sexual assaults that occurred on its campus.

174.    Upon information and belief, sexual assaults were reported to the administration of Dominican College prior to Megan Wright's attack, but Dominican College did not disclose those reported attacks.

175.    One sexual assault occurred in April 2006, approximately one month prior to the attack on Megan Wright. This assault was not publicly disclosed by Dominican College as required by the Clery Act.

176.    Upon information and belief, defendants O'Brien, Lennon, Prescott, and Hicks were involved in the decision to not disclose reported sexual attacks as required by the Clery Act.

177.    Dominican College's failure to disclose reported attacks falsely gave the impression that the school was safer than it actually was. Such information was material to Megan Wright's decision to choose to attend Dominican College.

178.    Megan Wright relied upon the false impression of safety created by Dominican College in connection with deciding which school to attend and whether to live on campus.

179.    As a result of Dominican College's omissions, Megan Wright was fraudulently induced to enroll at the school believing it to be a safe campus with no reported sexual assaults.

180.    Megan Wright sustained injuries, both physically and psychologically, as a result of Dominican College's and defendants O'Brien, Lennon, Prescott, and Hicks's failures to be truthful and candid.

## SEVENTH CAUSE OF ACTION

### (Deprivation of Federally Secured Rights against defendants Dominican College, O'Brien, Lennon, Prescott and Hicks)
(42 U.S.C. § 1983)

181.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 180 of this Complaint as if more fully set forth below.

182.    Defendant Dominican College collaborated with the Orangetown police department to deprive Megan Wright of her rights protected by the Clery Act.

183.    Defendant Dominican College, as a recipient of federal funding, acted under color of law when it deprived Megan Wright of her rights protected by the Clery Act.

184.    Megan Wright had the right to accurate disclosure by Dominican College with respect to reported crimes occurring on campus.

185.    This right is protected by the Clery Act which mandates accurate disclosure of crime statistics reported to occur on campus.

186.    Dominican College's refusal to publish accurate crime statistics led Megan Wright to believe the school's campus was safe, and, accordingly, was a substantial factor in bringing about Megan's attack and the consequences arising from that attack.

187.    Megan Wright sustained injuries, both physically and psychologically, as a result of Dominican College's deprivation of her Clery Act rights.  Consequently, she took her own life.

188.    Dominican College acted with reckless or callous indifference to federally protected rights of others entitling Plaintiff to exemplary or punitive damages.

## EIGHTH CAUSE OF ACTION

*(Wrongful death against defendants Dominican College, O'Brien, Lennon, Prescott, Hicks, Richard Fegins, Jr., Isaiah Lynch, and Kenneth A. Thorne, Jr.)*

189.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 188 of this Complaint as if more fully set forth below.

190.    Megan Wright died on December 16, 2006.

191.    Cynthia McGrath has been appointed as Megan Wright's personal representative.

192.    Megan Wright's death was caused by the assault upon her by defendants Fegins, Lynch, Thorne and Hill.

193.    Megan Wright's death was caused by the failure of defendants Dominican College, O'Brien, Lennon, Prescott, and Hicks either to protect Megan Wright from that assault or to respond to her complaint about that assault in any meaningful way.

194.    As a result of the wrongful conduct of defendants Fegins, Lynch, Thorne and Hill that they committed by conspiring to assault, and assaulting, Megan Wright, Megan Wright possessed timely claims for assault, battery, aiding and abetting a battery, conspiracy to commit a battery, intentional infliction of emotional distress, and false imprisonment against defendants Fegins, Lynch, Thorne and Hill at the time of her death.

195.    As a result of the wrongful conduct of defendants Dominican College, O'Brien, Lennon, Prescott, and Hicks by failing to respond to Megan's complaint about that assault in any

meaningful way, at the time of her death, Megan Wright possessed timely claims for Title IX,

premises liability, and breach of contract against defendant Dominican College, as well as claims

for negligence, intentional infliction of emotional distress, fraud and deprivation of federally

secured rights against defendants Dominican College, O'Brien, Lennon, Prescott, and Hicks.

196.     Megan Wright is survived by her mother, Cynthia McGrath, who depended on

Megan Wright to provide domestic services in their home before Megan Wright's death and

would have relied upon Megan Wright for economic support upon Megan's graduation from

college; as a result of Megan Wright's death, Cynthia McGrath has suffered a pecuniary loss in

the amount of the value of those lost services, which Cynthia McGrath expected Megan Wright

would have provided for years to come had she not died.

## NINTH CAUSE OF ACTION

### (Battery against Richard Fegins, Jr., Isaiah Lynch, and Kenneth A. Thorne, Jr.)

197.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 196

of this Complaint as if more fully set forth below.

198.     Defendants Fegins, Lynch, and Thorne intentionally came into bodily contact

with Megan Wright when they had sex with her without her consent.

199.     They knowingly engaged in this contact without Megan Wright's consent.

200.     This contact was harmful and offensive to Megan Wright because she did not

consent to it, and because it offended her sense of personal dignity.

201.     As a direct result of this contact, Megan Wright suffered severe physical and

emotional injuries.

## TENTH CAUSE OF ACTION

### *(Battery against Terrell E. Hill)*

202.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 201 of this Complaint as if more fully set forth below.

203.    Defendant Hill acted in concert with defendants Fegins, Lynch and Thorne to commit a battery upon Megan Wright.

204.    Defendant Hill had an agreement with defendants Fegins, Lynch and Thorne to help them engage in sexual conduct with Megan Wright without her consent.

205.    Defendant Hill furthered that agreement by bringing Megan Wright to the room where she was attacked, and remaining outside that room – occasionally entering the room or peering inside – without providing any assistance to Megan Wright.

206.    Due in part to defendant Hill's actions, defendants Fegins, Lynch and Thorne had sex with Megan Wright without her consent.

207.    As a direct result of defendant Hill's actions, Megan Wright suffered severe physical and emotional injuries.

## ELEVENTH CAUSE OF ACTION

### *(Aiding and Abetting a Battery against Richard Fegins, Jr., Isaiah Lynch, Kenneth A. Thorne, Jr., and Terrell E. Hill)*

208.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 207 of this Complaint as if more fully set forth below.

209.    By bringing Megan Wright to the room where she was sexually assaulted, defendant Hill encouraged the battery on Megan Wright.

210.    Defendant Hill further encouraged the battery by remaining outside the room, occasionally entering the room or peering inside when the door was opened for ingress and egress, throughout the attack without assisting Megan Wright.

211.    By confining Megan Wright to the room and watching each other forcibly have sex with Megan Wright, defendants Fegins, Lynch, and Thorne each encouraged the battery on Megan Wright.

212.    The encouragement of defendants Fegins, Lynch, Thorne and Hill was a substantial factor in causing the battery on Megan Wright.

213.    The wrongful and intentional acts committed by defendants Fegins, Lynch, Thorne and Hill resulted in Megan Wright's permanent departure from Dominican College and her subsequent persistent pain and suffering which arose from the fear, guilt, anxiety and embarrassment she suffered as a result of the attack on her by defendants Fegins, Lynch, Thorne and Hill.

214.    Megan Wright endured over seven months of pain and suffering following the attack which was caused by the deliberate indifference of defendants Fegins, Lynch, Thorne and Hill in conspiring to attack, and attacking, her.

215.    The pain and suffering experienced by Megan Wright continued until Megan Wright took her own life in December of 2006.

## TWELFTH CAUSE OF ACTION

***(Assault against Richard Fegins, Jr., Isaiah Lynch, Kenneth A. Thorne, Jr. and Terrell E. Hill)***

216.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 215 of this Complaint as if more fully set forth below.

217.    Defendants Fegins, Lynch, Thorne and Hill, acting individually and in concert, intentionally placed Megan Wright in apprehension of imminent harmful and offensive contact when they brought her into a room to have sex with her without her consent.

218.    As a result of the conduct of defendants Fegins, Lynch, Thorne and Hill, Megan Wright became concerned that they were about to cause such a harmful and offensive contact.

219.    Defendants Fegins, Lynch, and Thorne had the ability to bring about such harmful and offensive contact, which they did, in fact, cause when they had sex with Megan Wright without her consent.

220.    By reason of the above, Megan Wright was subjected to conscious pain and suffering caused by defendants Fegins, Lynch, Thorne and Hill on the day she was attacked in May 2006, until her death in December 2006.

## THIRTEENTH CAUSE OF ACTION

### *(False Imprisonment against Richard Fegins, Jr., Isaiah Lynch, and Kenneth A. Thorne, Jr.)*

221.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 220 of this Complaint as if more fully set forth below.

222.    Defendants Fegins, Lynch, Thorne and Hill intended to confine Megan Wright in a dorm room in the Residence Hall against her will.

223.    Megan Wright was aware of that confinement as she was unable to leave that room.

224.    Megan Wright did not consent to that confinement.

225.    Defendants Fegins, Lynch, Thorne and Hill lacked any privilege or other authority to confine Megan Wright.

226.   The wrongful and intentional acts committed by defendants Fegins, Lynch, Thorne, and Hill resulted in Megan Wright's permanent departure from Dominican College and her subsequent persistent pain and suffering which arose from the fear, guilt, anxiety and embarrassment she suffered as a result of the attack on her by defendants Fegins, Lynch, Thorne and Hill.

227.   Megan Wright endured over seven months of pain and suffering following the attack.

228.   The pain and suffering experienced by Megan Wright continued until Megan Wright took her own life in December of 2006.

## FOURTEENTH CAUSE OF ACTION

### *(Intentional Infliction of Emotional Distress against Richard Fegins, Jr., Isaiah Lynch, Kenneth A. Thorne, Jr., and Terrell E. Hill)*

229.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 228 of this Complaint as if more fully set forth below.

230.   Defendants Fegins, Lynch, Thorne, and Hill intentionally steered Megan Wright from her room in the Residence Hall to a second room where they attacked her.

231.   This outrageous conduct was sufficiently insensitive as to cause Megan Wright severe emotional distress.

232.   The wrongful and intentional acts committed by defendants Richard Fegins, Jr., Isaiah Lynch, Kenneth A. Thorne, Jr., and Terrell E. Hill resulted in Megan Wright's permanent departure from Dominican College and her subsequent persistent pain and suffering which arose from the fear, guilt, anxiety and embarrassment Megan Wright suffered as a result of the attack on her by defendants Fegins, Lynch, Thorne, and Hill.

233.    Megan Wright endured over seven months of pain and suffering following the attack which was caused by the deliberate indifference of defendants Fegins, Lynch, Thorne and Hill in conspiring to attack, and attacking, her.

234.    The pain and suffering experienced by Megan Wright continued until Megan Wright took her own life in December of 2006.

## FIFTEENTH CAUSE OF ACTION

### (Conspiracy to commit battery against Richard Fegins, Jr., Isaiah Lynch, Kenneth A. Thorne, Jr., and Terrell E. Hill)

235.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 234 of this Complaint as if more fully set forth below.

236.    Defendants Fegins, Lynch, Thorne and Hill agreed amongst themselves to sexually attack Megan Wright.

237.    By bringing Megan Wright to the room where she was sexually assaulted, defendant Hill enabled the battery to occur.  In this manner, he acted in concert with defendants Fegins, Lynch and Thorne to help them sexually assault Megan Wright.

238.    Defendant Hill further acted in concert with defendants Fegins, Lynch and Thorne when he encouraged the battery by remaining outside the room, occasionally entering the room or peering inside when the door was opened for ingress and egress, watching portions of the assault, and cheering on the assailants throughout the attack, without assisting Megan Wright.

239.    As a result of Hill's encouragement and assistance, Hill enabled the attack on Megan Wright to occur.

240.    As a result, Megan Wright was psychologically damaged to the point that she took her own life.

241.    The wrongful and intentional acts committed by defendants Fegins, Lynch,

Thorne and Hill resulted in Megan Wright's permanent departure from Dominican College and

her subsequent persistent pain and suffering which arose from the fear, guilt, anxiety and

embarrassment she suffered as a result of the attack on her by defendants Fegins, Lynch, Thorne

and Hill.

242.    Megan Wright endured over seven months of pain and suffering following the

attack.

243.    The pain and suffering experienced by Megan Wright continued until Megan

Wright took her own life in December of 2006.

## JURY DEMAND

244.    Plaintiff requests a trial by jury.

**WHEREFORE**, Plaintiff demands the following relief:

1.    on the First Cause of Action, damages to be determined at trial plus any

exemplary damages and attorneys fees as provided by the statute;

2.    on the Second Cause of Action, damages to be determined at trial;

3.    on the Third Cause of Action, damages to be determined at trial;

4.    on the Fourth Cause of Action, damages to be determined at trial;

5.    on the Fifth Cause of Action, damages to be determined at trial;

6.    on the Sixth Cause of Action, damages to be determined at trial;

7.    on the Seventh Cause of Action, damages to be determined at trial;

8.    on the Eighth Cause of Action, damages to be determined at trial;

9.    on the Ninth Cause of Action, damages to be determined at trial;

10.    on the Tenth Cause of Action, damages to be determined at trial;

11.    on the Eleventh Cause of Action, damages to be determined at trial;

12.    on the Twelfth Cause of Action, damages to be determined at trial;

13.    on the Thirteenth Cause of Action, damages to be determined at trial;

14.    on the Fourteenth Cause of Action, damages to be determined at trial;

15.    on the Fifteenth Cause of Action, damages to be determined at trial;

16.    on the Second, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth and Fifteenth Causes of Action, punitive damages to be determined at trial but in no event less than $10 million;

17.    judgment awarding Plaintiff her costs, disbursements and attorneys' fees incurred in this action; and

18.    such other relief as the Court deems proper.

Dated:  New York, New York
        December 14, 2007

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP

By: _____
        Andrew L. Morrison (AM-1071)
        Sarah P. Kenney (SK-5642)
        599 Lexington Avenue
        New York, New York 10022
        212-536-3900
        Attorneys for Plaintiff