Andrew L. Morrison (AM-1071)
Sarah P. Kenney (SK-5642)
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
212-536-3900

Attorneys for Plaintiff
Cynthia McGrath, individually and as
Administratrix Ad Prosequendum of the Estate
of Megan Wright, Deceased, and as General
Administratrix of the Estate of Megan K.
Wright Deceased

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

CYNTHIA McGRATH, INDIVIDUALLY AND AS     :
ADMINISTRATRIX AD PROSEQUENDUM OF THE
ESTATE OF MEGAN K. WRIGHT, DECEASED, AND     :
AS GENERAL ADMINISTRATRIX OF THE ESTATE
OF MEGAN K. WRIGHT, DECEASED,     :

             Plaintiff,     :

    - against -     :

DOMINICAN COLLEGE OF BLAUVELT,
NEW YORK, SISTER MARY EILEEN O'BRIEN,     :
INDIVIDUALLY AND AS PRESIDENT OF
DOMINICAN COLLEGE, JOHN LENNON,
INDIVIDUALLY AND AS DIRECTOR OF
SECURITY OF DOMINICAN COLLEGE, JOHN     :
PRESCOTT, INDIVIDUALLY AND AS DEAN OF
STUDENTS OF DOMINICAN COLLEGE, CARLYLE
HICKS, INDIVIDUALLY AND AS DIRECTOR OF     :
RESIDENT LIFE OF DOMINICAN COLLEGE,
RICHARD FEGINS, JR., KENNETH A. THORNE, JR.,     :
ISAIAH LYNCH, and TERRELL E. HILL,

             Defendants.     :

-------------------------------------------------------------------X

07 Civ. 11279 (SCR)(GAY)

**MEMORANDUM OF LAW
IN OPPOSITION TO THE
DOMINICAN COLLEGE
DEFENDANTS' MOTION
TO DISMISS CERTAIN
CLAIMS IN THE
AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

FACTS ............................................................................................................. 4

ARGUMENT .................................................................................................... 10

I.    THE AMENDED COMPLAINT STATES A CLAIM AGAINST DOMINICAN
COLLEGE FOR VIOLATION OF TITLE IX ................................................ 10

      A.    The Applicable Standard................................................................ 10

      B.    The Dominican College Defendants' Arguments Ignore The Allegations Of
The Amended Complaint ............................................................... 11

      C.    The Amended Complaint Alleges Deliberate Indifference ................. 12

      D.    The Discrimination Was So Severe That It Barred Megan Wright's Access
To An Educational Opportunity....................................................... 15

      E.    The Amended Complaint Alleges Far More Than Inadequate Policies and
Procedures .................................................................................. 16

II.    THE AMENDED COMPLAINT STATES A § 1983 CLAIM ......................... 16

      A.    Dominican College Acted Under Color Of State Law ........................ 17

      B.    Megan Wright's Federally Secured Rights Were Violated .................. 18

      C.    A § 1983 Claim Is Stated Against The Individual Dominican College
Defendants .................................................................................. 19

III.    THE AMENDED COMPLAINT STATES A FRAUD CLAIM ........................ 20

      A.    All Of The Fraud Elements Are Alleged With Sufficient Particularity......... 20

      B.    The Defendants Had A Duty To Disclose Reported Sexual Assaults
Independent Of the Clery Act ........................................................ 21

IV.    THE AMENDED COMPLAINT STATES A CLAIM FOR INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS................................................ 23

CONCLUSION.................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

Acad. Sch. Dist. No. 20, OCR Case No. 8-93-1023 (Dep't of Educ. April 16, 1993) .................14

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).........................................................16, 17, 18

Aspex Eyewear, Inc. v. Clariti Eyewear, Inc., 2008 WL 219765 (S.D.N.Y. Jan. 24, 2008).....4 n.4

Audi Vision Inc. v. RCA Mfg. Co., 136 F.2d 621 (2d Cir.1943) .................................................24

Back v. Hastings on Hudson Union Free School District, 365 F.3d 107 (2d Cir. 2004)...............19

Bell Atlantic Corp. v. Twombly, 550 U.S. 127 S.Ct. 1955 (2007)...........................................4 n.4

Bender v. City of New York, 78 F.3d 787 (2d Cir. 1996) ..............................................................23

Blum v. Yaretsky, 457 U.S. 991 (1982) .........................................................................................18

Coakley v. Jaffe, 49 F.Supp.2d 615 (S.D.N.Y. 1999) ...................................................................17

Daniels v. City of Binghamton, 1998 WL 357336 (N.D.N.Y. June 29, 1998)........................17, 18

Davis v. Monroe County Board of Education, 526 U.S. 629 (1999)........................................11, 13

DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189 (1989)............................18

Dennis v. Sparks, 449 U.S. 24 (1980)............................................................................................17

Eagleston v. County of Suffolk, 790 F.Supp. 416 (E.D.N.Y. 1992) ..............................................18

Franklin v. Gwinnett County Public Sch., 503 U.S. 60 (1992) .....................................................10

Friedman v. New York City Admin. for Children's Servs., 2005 WL 2436219 (E.D.N.Y.
    Sept. 30, 2005)........................................................................................................17, 24

Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998)...............................12, 16

IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049 (2d Cir. 1993).......................................21

Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) ................................................................18 n.9

Manzi v. DiCarlo, 62 F.Supp.2d 780 (E.D.N.Y. 1999) .................................................................24

McKinney v. Bellevue Hospital, 584 N.Y.S.2d 538 (1st Dep't 1992) ...........................................22

McKinnon v. Patterson, 568 F.2d 930 (2d Cir. 1978) ..................................................20

Mills Pub. Sch. Dist., OCR Case No. 01-93-1123 (Dep't of Educ. May 19, 1994) ....................14

Monell v. Dep't of Social Servs., 436 U.S. 658 (1978) ...........................................19, 20

Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238 (10th Cir. 1999) ..............................15

Oden v. Northern Marianas College, 440 F.3d 1085 (9th Cir. 2006) ...................................12, 13

P.T. Bank Central Asia v. ABN AMO Bank N.V., 301 A.D.2d 373, 754 N.Y.S.2d
    245 (1st Dep't 2003) ...........................................................................20, 22

Rendell-Baker v. Kohn, 457 U.S. 830 (1982) ............................................................18

Romano v. SLS Residential Inc., 246 F.R.D. 432 (S.D.N.Y. 2007) ....................................4 n.4

Sanders v. Sears, Roebuck & Co., 984 F.2d 972 (8th Cir. 1993) ........................................19

Turpin v. Mailet, 619 F.2d 196, 199-200 (2d Cir. 1980) ..............................................20

Vance v. Spencer County Public School District, 231 F.3d 253 (6th Cir. 2000) ...................13, 14

Wait v. Beck's North Am., Inc., 241 F. Supp. 2d 172 (N.D.N.Y. 2003) ......................................23

Williams v. Bd. of Regents of the Univ. Sys. of Georgia, 477 F.3d 1282
    (11th Cir. 2007) .........................................................................11, 14, 15

## STATUTES

20 U.S.C. § 1092..............................................................................3, 5, 6, 20, 21

20 U.S.C. § 1681 ................................................................................... passim

42 U.S.C. § 1983..............................................................................3, 16, 19

Fed. R. Civ. P. 9 .....................................................................................22

## TREATISES

Prosser, Torts § 33 (4th ed.)...........................................................................22

## PRELIMINARY STATEMENT[1]

In the Amended Complaint filed in this action, Plaintiff Cynthia McGrath, individually and as the representative of her deceased daughter, Megan Wright, sets forth in painstaking detail how Dominican College and its administrators were deliberately indifferent to Megan's prompt report that she had been sexually attacked in a campus residence hall by three men (two student athletes and their guest) after a late night party occurring at the end of the spring semester of Megan's freshman year, days before the final examination period.  The Amended Complaint describes in detail how Dominican College's failure to respond to Megan Wright's complaint in any meaningful way was consistent with its course of conduct involving similar student complaints of sexual harassment.  Specifically, Dominican College would direct the complaining student to a local police detective who was on the school's payroll and then refuse to undertake an independent investigation, deferring to the police "investigation."

The Amended Complaint details how during his "investigation," the local police detective failed to even visit the alleged crime scene or interview important witnesses, including the nurse who examined Megan Wright hours after the attack.  Instead, he swiftly concluded that Megan must have consented to engaging in sex with three men -- all unfamiliar to her -- at the same time in a dorm room that was not hers while a crowd outside in the hallway rooted them on, because her handwriting apparently matched the handwriting that appeared on a "sign" that

---

[1]    Defendants Dominican College of Blauvelt, New York, Sister Mary Eileen O'Brien, John Lennon, John Prescott and Carlyle Hicks, sued individually and in their representative capacities (collectively, the "Dominican College Defendants") move to dismiss only certain claims asserted against them:  First Cause of Action (Violation of Title IX against Dominican College); Fifth Cause of Action (Intentional Infliction of Emotion Distress against Dominican College and Defendants O'Brien, Lennon, Prescott and Hicks); Sixth Cause of Action (Fraud against Dominican College and Defendants O'Brien, Lennon, Prescott and Hicks); and Seventh Cause of Action (Deprivation of Federally Secured Rights against Dominican College and Defendants O'Brien, Lennon, Prescott and Hicks).  The Dominican College Defendants do not seek dismissal of the following claims asserted against them in the Amended Complaint:  (i) Second Cause of Action (Premises Liability against Dominican College); (ii) Third Cause of Action (Negligence against Dominican College and Defendants O'Brien, Lennon, Prescott and Hicks); (iii) Fourth Cause of Action (Breach of Contract against Dominican College); and (iv) Eighth Cause of Action (Wrongful Death against Dominican College and, <u>inter alia</u>, Defendants O'Brien, Lennon, Prescott and Hicks).

read "I WANT To HAVE SEX." One of the attackers held this sign up to a security camera during the attack and later voluntarily submitted it to the police detective as purported proof of his innocence. The detective's "conclusion" that Megan Wright gave her consent based upon this "writing" defies all reason and logic and is contrary to the written policies of Dominican College that explicitly acknowledge that a writing cannot dispositively determine the issue of consent.[2]

Yet, Dominican College adopted the detective's "conclusion" and refused to undertake its own investigation. In addition, Dominican's President refused to meet with either Megan Wright or her mother during the summer to discuss how the attack impacted Megan's plans to return to Dominican for the fall semester of her sophomore year. Despite repeated efforts to open a dialog, the office of the President maintained complete silence with Megan and her mother -- not even a telephone call to see how Megan was doing.

Dominican College and its administrators elected to ignore rather than address the brutal reality that three men violated Megan Wright, in the same room and at the same time, in a manner that the SANE nurse's medical records confirm was forced. Shockingly, these facts did not prompt a school investigation and, instead, the school deferred to a superficial and conclusory police investigation conducted by a hopelessly conflicted local police detective. The conduct of the school and its administrators clearly was unreasonable under the circumstances.

Dominican College and its administrators' insensitivity and callousness continues to exist and pervades their motion to dismiss. Dominican College and its administrators cavalierly sum up the Amended Complaint as follows:

> Plaintiff alleges little more than that the decedent's claims were not treated as seriously as Megan Wright would have liked. * * * Mere disappointment or dissatisfaction with the College's response to her report of sexual assault is insufficient.

---

[2] The "consent form" should have raised more questions than it answered. Clearly, the attackers were concerned about the issue of consent; it is not normal for a participant in consensual sex to ask his or her partner to sign a "consent form" and then display it to a security camera.

(Dominican Defs. Br. at 8)[3]

      This action is not about what Megan Wright "would have liked." This action is about the tragic result arising from Dominican College's unreasonable abdication of its common law, contractual and statutory responsibilities owed to the young men and women who make up its student body.

      As set forth below, the Dominican College Defendants' motion to dismiss some of the claims asserted in the Amended Complaint should be denied because:

- The Amended Complaint states a claim against Dominican College for violation of Title IX. The Amended Complaint alleges facts demonstrating that Dominican College discriminated on the basis of gender when it acted with deliberate indifference to Megan Wright's complaint.

- The Amended Complaint states a claim under 42 U. S. C. § 1983. The Amended Complaint details how Dominican College and defendants O'Brien, Lennon, Prescott and Hicks acted under color of state law by delegating their obligations to conduct investigations of sexual harassment to the Orangetown Police department. Further, the Orangetown Police department operated under a debilitating and undisclosed conflict of interest, thereby rendering the delegated investigation futile in derogation of Megan Wright's federal rights.

- The Amended Complaint states a fraud claim against Dominican College and defendants O'Brien, Lennon, Prescott and Hicks. The Amended Complaint alleges a course of conduct whereby these defendants withheld material facts from prospective and current students relating to campus safety. Their duty to disclose arises independently from the Clery Act. The Amended Complaint alleges that Megan Wright relied upon defendants' omissions to her detriment.

- The Amended Complaint states a claim against Dominican College and defendants O'Brien, Lennon, Prescott and Hicks for intentional infliction of emotional distress. The Amended Complaint alleges extreme misconduct that falls within the parameters of this common law tort. In addition, the damages sought by this claim are different than the damages sought in the other claims asserted against these defendants.

---

[3]    The Dominican College Defendants' Memorandum of Law submitted in support of their motion and dated February 8, 2008 is referred to herein as "Dominican Defs. Br."

## FACTS[4]

The facts are set forth more fully in the Amended Complaint.[5]  They are summarized below.

### The Parties

Plaintiff Cynthia McGrath is the mother of Megan Wright and is both the Administratrix Ad Prosequendum and the General Administratrix of the Estate of Megan K. Wright.  (Am. Comp. ¶ 10)  Ms. McGrath is also Megan Wright's sole distributee.  (Am. Comp. ¶ 10)  The plaintiff's decedent, Megan Wright, enrolled as a freshman at Dominican College for the 2005/2006 school year.  (Am. Comp. ¶ 11)  Megan lived on campus during her freshman year. (Am. Comp. ¶ 11)

Defendant Dominican College is a private institution of learning that receives federal funding and is located in Orangeburg, New York.  (Am. Comp. ¶ 12)  Defendant Sister Mary Eileen O'Brien ("O'Brien") at all times relevant to this lawsuit was the President of Dominican College.  (Am. Comp. ¶ 13)  Defendant John Lennon ("Lennon") at all times relevant to this lawsuit was the Director of Security of Dominican College.  (Am. Comp. ¶ 14)  Defendant John Prescott ("Prescott") at all times relevant to this lawsuit was the Dean of Students of Dominican College.  (Am. Comp. ¶ 15)  Upon information and belief, Defendant Carlyle Hicks ("Hicks") at

---

[4]  Upon considering a motion to dismiss, courts must accept the factual allegations set forth in the complaint as true, view the allegations in the light most favorable to the non-moving party and draw all inferences in favor of the non-moving party.  See Romano v. SLS Residential Inc., 246 F.R.D. 432, 439 (S.D.N.Y. 2007).  The court's treatment of the allegations in the complaint has not been altered by the United States Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (2007), which did change the standard employed by the courts in determining whether a complaint states a claim.  See Aspex Eyewear, Inc. v. Clariti Eyewear, Inc., 2008 WL 219765, at *1 (S.D.N.Y. Jan. 24, 2008) ("As interpreted by the Second Circuit, Bell Atlantic Corp. did not announce a 'universal standard of heightened fact pleading, but . . . instead requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*'") (citation omitted; italics in original).

[5]  The Amended Complaint, dated January 29, 2008, is annexed as Exhibit "A" to the accompanying Affidavit of Sarah P. Kenney, sworn to March 17, 2008.

all times relevant to this lawsuit was the Director of Resident Life for Dominican College.  (Am. Comp. ¶ 16)

## Dominican's Code of Conduct and Security Policies

Megan Wright matriculated as a full-time freshman student at Dominican College in late August 2005.  (Am. Comp. ¶ 23)  Megan Wright was assigned to live on campus in a Residence Hall known as Hertel Hall.  (Am. Comp. ¶ 31)  Among the documents received by Megan Wright upon her arrival was Dominican College's Code of Conduct for its students (the "Code of Conduct").  (Am. Comp. ¶¶ 32, 33)  The Code of Conduct acknowledged Dominican College's "obligation" to "protect" its students and specifically stated that Dominican College "**accepts its obligation to provide for its members an atmosphere that protects and promotes its educational mission and which guarantees its orderly and effective operation.**"  (Am. Comp. ¶ 35) (emphasis added)

The Code of Conduct also states, in pertinent part:

> Dominican College **does not recognize a victim's signed consent, waiver, or release as an absolute defense to a claim of sexual assault**.

(Am. Comp. ¶ 40) (emphasis added)

## Dominican College's Knowledge of a Prior Reported Sexual Assault

In April 2006, just one month prior to the attack on Megan Wright, another female student was sexually assaulted in a Dominican College campus Residence Hall, in a similar manner to the attack on Megan Wright.  (Am. Comp. ¶ 49)  Dominican College failed to investigate this April 2006 assault.  (Am. Comp. ¶ 50)  The school's only response was to hold a non-mandatory student meeting that lasted no more than five minutes.  (Am. Comp. ¶ 50)  In addition, Dominican College steered the victim of that assault to the same Orangetown police detective who would later handle Megan Wright's complaint.  (Am. Comp. ¶ 51)  As set forth below, this detective was severely conflicted due to his relationship with Dominican College; he did not pursue either investigation.  (Am. Comp. ¶ 51)  Dominican College failed to disclose the report of the April 2006 assault in violation of federal law, including the Clery Act, 20 U.S.C.

§ 1092. (Am. Comp. ¶ 53) Based upon Dominican College's conduct in response to both the April 2006 assault and the assault on Megan Wright, and upon information and belief, Dominican College failed to disclose other reported sexual assaults occurring on campus prior to Megan Wright's attendance at the school. (Am. Comp. ¶ 188)

**Megan Wright's Sexual Assault**

On or about May 7, 2006, Megan Wright was raped by defendants Richard Fegins, Jr., Isaiah Lynch, and Kenneth A. Thorne, Jr. in a Dominican College Residence Hall. (Am. Comp. ¶ 55) At that time, defendants Fegins and Lynch were students at the school and defendant Thorne was a guest. (Am. Comp. ¶ 55) The attack occurred after a late night party in Megan Wright's campus Residence Hall during which students were openly consuming alcoholic beverages in violation of school policy. (Am. Comp. ¶ 56) Upon leaving the party, Megan Wright returned to her room. (Am. Comp. ¶ 57) Before she could open the door to her room, defendants Terrell E. Hill and Kenneth A. Thorne, Jr. (who had followed Megan Wright from the party to her room) physically turned Megan Wright around, and brought her to another room. (Am. Comp. ¶ 57) Defendant Thorne lead Megan into the second room and raped her. (Am. Comp. ¶ 58) Shortly thereafter, defendants Fegins and Lynch appeared and defendant Thorne allowed them access to the room. (Am. Comp. ¶ 59) Upon entering the room, Fegins and Lynch each raped Megan Wright. (Am. Comp. ¶ 60) Throughout the assault on Megan Wright, several male students congregated outside the room where the assault was occurring. (Am. Comp. ¶ 61) Several students were peeking into the room when the door opened for the attackers' ingress and egress and were "high fiving" one another at various times during the assault. (Am. Comp. ¶ 61)

While Megan Wright was still in the room, one of the assailants exited the room and held up a white sign, which purportedly contained Megan Wright's signature, to the surveillance cameras so that the camera could pick up the words printed on the sign above the signature: "I WANT To HAVE SEX". (Am. Comp. ¶ 62)

Megan Wright awoke the next morning, May 8, 2006, believing that something was wrong. (Am. Comp. ¶ 66) She had a vague recollection of the events of the previous evening;

- 6 -

she noticed that she was wearing different clothes and was sore and bleeding in the vaginal area. (Am. Comp. ¶ 66)

Megan Wright asked a friend to take her to White Plains Hospital for purposes of having a rape kit and SANE examination performed.[6]  (Am. Comp. ¶ 67)  The examination confirmed that substantial injuries, including bruising and lacerations, indicated forced rape.  (Am. Comp. ¶ 68)  The SANE nurse on duty that day, in fifteen years of practice, had rarely seen a victim evincing more physical trauma than Megan Wright.  (Am. Comp. ¶ 69)

**Dominican College's Deliberate Indifference**

Megan Wright promptly informed Dominican College of the sexual assault that occurred on May 7, 2006.  (Am. Comp. ¶ 70)  Dominican College's Dean of Students, defendant Prescott, referred Megan to the Orangetown police department, but failed to mention to her that there were other campus procedures for filing complaints.  (Am. Comp. ¶ 71)  Defendant Prescott did not offer any further assistance to Megan aside from suggesting that she obtain counseling from the school's therapist.  (Am. Comp. ¶ 71)

In fact, no accommodations were made for Megan Wright.  (Am. Comp. ¶ 72)  The school did not reassign her room in the Residence Halls.  (Am. Comp. ¶ 72)  The school even denied Megan's requests to take her final exams at a different location using exam proctors. (Am. Comp. ¶ 72)  Despite her attempts to do so, Megan Wright was unable to take her final exams.  (Am. Comp. ¶ 73)

Megan repeatedly sought assistance from the school only to be told that the school would neither take any action nor conduct its own independent investigation until the conclusion of the criminal investigation undertaken by the Orangetown police department.  (Am. Comp. ¶ 74)

It took over a month from the date of the attack for defendant Prescott to view the security videotape taken from the Residence Hall.  (Am. Comp. ¶ 75)  This tape showed Megan

---

[6]      "SANE" is the abbreviation for Sexual Assault Nurse Examiner Program, which provides direct patient care to victims of sexual assault. Participants of SANE deliver coordinated, expert forensic and medical care necessary to increase successful prosecution of sex offenders and to assure essential medical intervention to victims of assault.

being followed into a Residence Hall room, the entrance into that room by her three alleged assailants, and the presence of another group of men gathered outside the door of that room. (Am. Comp. ¶ 75)  Megan Wright and her mother, Ms. McGrath, met with the defendant Prescott in June and were told that Megan's complaint would be "difficult to prove."  (Am. Comp. ¶ 76)  Prescott discouraged Megan from pursuing a complaint through the school.  (Am. Comp. ¶ 76)

**The Criminal Investigation Was Severely Compromised Due to Conflict of Interest**

Dominican College directed Megan to pursue the criminal investigation with a detective in the Orangetown police department who, unbeknownst to Megan at the time, was employed by Dominican College as an instructor.  (Am. Comp. ¶ 78)  Megan met with the detective on or about May 15, 2006, after her final exams period.  (Am. Comp. ¶ 80)  Megan gave the detective the underwear and other articles of clothing that she had worn during the night of the rape; those items included samples of her blood.  (Am. Comp. ¶ 80)  The detective interviewed Megan alone for approximately 20 minutes.  (Am. Comp. ¶ 80)

Although the detective promised to report the results of a preliminary investigation within 10 days, neither Megan nor Ms. McGrath heard from the detective over the following few weeks. (Am. Comp. ¶ 81)  During its alleged "investigation," the police department did not investigate the room where Megan Wright alleged she was attacked.  (Am. Comp. ¶ 82)  When asked why the Police department did not investigate the room, the detective told Ms. McGrath that "they only do that on TV".  (Am. Comp. ¶ 82)  The Police department did not treat that room as a crime scene.  (Am. Comp. ¶ 82)  Nor did they gather any evidence from that room.  (Am. Comp. ¶ 82)  In fact, no one from the Orangetown police department visited that room in connection with any investigation of Megan Wright's allegations.  (Am. Comp. ¶ 82)

The detective failed to contact either Megan Wright or Ms. McGrath for weeks during the summer of 2006.  (Am. Comp. ¶ 83)  Concerned by this sustained period of silence, Ms. McGrath called the detective.  (Am. Comp. ¶ 83)  During that call, the detective asked to meet

with Megan Wright and Ms. McGrath.  (Am. Comp. ¶ 83)  When they later met, the detective viewed with Megan and her mother the surveillance videotape taken from the Residence Hall on the night of the attack.  (Am. Comp. ¶ 83)

The detective at that time indicated that he was aware of another reported sexual assault that occurred on campus in April 2006.  (Am. Comp. ¶ 84)  The detective was aware of the April 2006 assault because, upon information and belief, the school had steered the victim of that assault to him.  (Am. Comp. ¶ 85)

After the attack on Megan Wright, one of the alleged assailants had -- on his own volition -- visited the office of the Orangetown police department to claim that he had consensual sex with Megan and indicated that Megan had printed the sign "I WANT To HAVE SEX" and signed it prior to the assault.  (Am. Comp. ¶ 90)  The detective took a writing sample from Megan by asking her to write on a similarly sized piece of paper the words:  "I WANT To HAVE SEX."  (Am. Comp. ¶ 86)  The detective retained this sample from Megan.  (Am. Comp. ¶ 86)  In his police report, the detective later indicated that his refusal to investigate the assault was due, at least in part, to the fact that he believed that Megan Wright's handwriting matched the writing on that sign.  (Am. Comp. ¶ 86)  Neither the police nor the school made a finding about whether Megan Wright was compelled or threatened to write on the sign, whether any of her assailants held or forced her hand or whether Megan Wright possessed a competent mental state to knowingly give her consent.

### Dominican College Refused to Pursue the Matter

In June 2006, Ms. McGrath and Megan Wright met with the Dean of Students at Dominican College.  (Am. Comp. ¶ 92)  At that time, the Dean indicated that the police investigation was proceeding but no independent school investigation had occurred.  (Am. Comp. ¶ 92)  The Dean conceded that he still had not viewed the hallway videotape and that he had not conducted any interviews with the alleged assailants.  (Am. Comp. ¶ 92)  He indicated that he was awaiting additional information from the detectives at the Orangetown police department.  (Am. Comp. ¶ 92)

Ms. McGrath asked defendant Prescott if the alleged assailants would be suspended from school. The Dean indicated that there would be no such suspensions. (Am. Comp. ¶ 93) Ms. McGrath informed the Dean that Megan would have to withdraw from school due to fear for her safety. (Am. Comp. ¶ 93)

After the meeting with the Dean of Students, Ms. McGrath and Megan Wright requested a meeting with the President of Dominican College, Sister Mary Eileen O'Brien. Sister O'Brien refused to meet with either Ms. McGrath or Megan Wright. (Am. Comp. ¶ 94) Dominican College never communicated either a written or verbal report of any investigation to either Ms. McGrath or Megan Wright. (Am. Comp. ¶ 95) Megan Wright and her mother told the Dean of Students that Megan was fearful of another attack if she returned to school. The school offered no accommodation. (Am. Comp. ¶ 96) Megan Wright did not return to campus for the fall semester of the 2006/2007 school year. (Am. Comp. ¶ 97)

Megan Wright took her own life in December 2006 in her own bedroom with her mother and brother in the house. (Am. Comp. ¶ 104)

## ARGUMENT

## POINT I

### THE AMENDED COMPLAINT STATES A CLAIM AGAINST DOMINICAN COLLEGE FOR VIOLATION OF TITLE IX

**A.     The Applicable Standard**

Title IX provides, in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Title IX is enforceable through an implied private right of action seeking monetary damages. Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 76 (1992). Sexual harassment is considered discrimination in the school context under Title IX, and a plaintiff may recover for student on student harassment, if the plaintiff can demonstrate four elements:

- 10 -

(1)     defendant is a Title IX funding recipient;

(2)     an appropriate person has actual knowledge of the discrimination or harassment the plaintiff alleges occurred;

(3)     the funding recipient has acted with deliberate indifference to known acts of harassment; and

(4)     the discrimination is so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.

See Williams v. Bd. of Regents of the Univ. Sys. of Georgia, 477 F.3d 1282, 1293 (11th Cir. 2007).  Courts will find deliberate indifference where a plaintiff demonstrates that the school's response to the harassment or its lack of response is "clearly unreasonable in light of the known circumstances."  Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 648 (1999).

**B.     The Dominican College Defendants' Arguments Ignore The Allegations Of The Amended Complaint**

Dominican College argues that Plaintiff Cynthia McGrath has failed to allege a Title IX violation as a matter of law.  (Dominican Def. Br. at 1)  To support this argument, Dominican College argues that the Amended Complaint's Title IX claim is predicated upon "two distinct scenarios for liability: 1) that Dominican College failed to prevent the sexual assault on Megan Wright by showing a deliberate indifference to alleged prior sexual assaults; and 2) that Dominican College failed to implement policies and procedures related to the handling of reports of sexual assault as required by Title IX."  (Dominican Def. Br. at 1-2)  Dominican College's argument displays a fundamental misunderstanding of Title IX and ignores the allegations of the Amended Complaint.

Title IX does not exist to protect students from future attacks; Title IX exists to eradicate gender discrimination by institutions receiving federal funding.  Williams, 477 F.3d at 1293. The Amended Complaint alleges that Dominican College violated Title IX because it was deliberately indifferent to Megan Wright's complaint **after** the attack occurred.  The Amended Complaint does not allege that Dominican violated Title IX because it "failed to prevent the

sexual assault on Megan Wright by showing a deliberate indifference to alleged prior sexual assaults." (Dominican Def. Br. at 1-2)

Accordingly, the case law relied upon by Dominican College -- all of them recognize that there is a private right of action for monetary damages under Title IX -- is inapposite. For instance, Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998) -- a case relied upon heavily by Dominican College -- involved a high school student who was involved in a longstanding consensual sexual relationship with one of her teachers. The student did not report the teacher's improper conduct and the school district had no knowledge of the sexual harassment until a police officer discovered the couple while they were engaged in sexual intercourse and arrested the teacher. Id. at 278. The Gebser Court refused to find Title IX liability against the school district based upon its mere status as the employer of the teacher under the theories of respondeat superior or constructive notice. Id. at 285. Rather, the Gebser Court found that the school district could not be liable without actual notice of the improper conduct. Id.

In stark contrast to Gebser, the Amended Complaint alleges in great detail, that Dominican College had actual notice of the student on student harassment reported by Megan Wright. Megan Wright reported the incident to school officials immediately after her attack, unlike the student in Gebser who never reported her teacher's sexual harassment. The Amended Complaint alleges that Dominican College acted with deliberate indifference after it was aware of the sexual harassment reported by Megan Wright.

**C.     The Amended Complaint Alleges Deliberate Indifference**

The first two elements of a Title IX violation, that Dominican College is a recipient of federal funding and that "appropriate" persons at Dominican have actual knowledge of Megan's complaint cannot be disputed. Dominican takes issue with the third element, namely whether the Amended Complaint alleges deliberate indifference. Relying upon Oden v. Northern Marianas College, 440 F.3d 1085 (9th Cir. 2006), Dominican College argues that to successfully allege

deliberate indifference Ms. McGrath must allege that Dominican College deliberately attempted to sabotage Megan Wright's complaint or its orderly resolution. (Dominican Def. Br. at 4)

A "deliberate attempt to sabotage" is not the standard; in fact, it is plainly wrong and is a mischaracterization of the court's holding in <u>Oden</u>. <u>Oden</u> involved a student's complaint of sexual harassment against her music professor, Dalla Pozza. <u>Id.</u> at 1087. The court -- on summary judgment and not on a motion directed at the pleading -- found that the facts presented did not support a finding of deliberate indifference. <u>Id.</u> at 1089. Specifically, the court found that:

> The College began to act as soon as it became aware of Plaintiff's allegations. Two counselors were assigned to Plaintiff to provide psychological and practical support; they met with her more than a dozen times; they assisted her in filing a formal complaint; and they helped her drop Dalla Pozza's class immediately. After the complaint was filed, the College served it on Dalla Pozza. He was instructed not to have any contact with Plaintiff. Eventually a hearing took place, Plaintiff was believed, and Dalla Pozza was significantly disciplined.

<u>Id.</u> The plaintiff alleged that a nine month delay in convening a hearing violated Title IX. <u>Id.</u> The court found that there were reasons for the school's delay, including allowing time for plaintiff to retain a lawyer and allowing for delay caused by plaintiff's relocation to New Mexico. <u>Id.</u> The court held: "[w]e need not and do not decide that a delay *never* can constitute deliberate indifference; we decide only that this record does not permit an inference that the delay was a deliberate attempt to sabotage Plaintiff's complaint or its orderly resolution." <u>Id.</u> (emphasis in original). The <u>Oden</u> court explicitly narrowed its holding to the factual record before it and certainly did not hold that a plaintiff has to demonstrate a deliberate attempt to sabotage a harassment complaint in order to demonstrate a violation of Title IX.

The correct standard for deliberate indifference is whether the school failed to act reasonably under the circumstances. See <u>Davis</u>, 526 U.S. at 648 (finding recipients are deliberately indifferent "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances"). In <u>Vance v. Spencer County Public School District</u>, 231 F.3d 253 (6th Cir. 2000), the defendant -- similar to the Dominican College

- 13 -

Defendants here -- argued "as long as a school district does something in response to harassment, it has satisfied the [deliberate indifference] standard." Id. at 260 (brackets added). The United States Court of Appeals for the Sixth Circuit explicitly rejected this standard and held:

> If this Court were to accept [the school's] argument, a school district could satisfy its obligation where a student has been raped by merely investigating and absolutely nothing more. Such minimalist response is not within the contemplation of a reasonable response.

Id. at 260.

In Williams, the Eleventh Circuit found a delay of eight months to conduct a disciplinary hearing and eleven months to take corrective action after a female student complained that she had been sexually harassed by three students met the standard for deliberate indifference. 477 F.3d at 1296-97. The college argued that it was waiting for the related criminal trials to run their course. Id. at 1297. The court rejected the school's deferral to the criminal system and held:

> To the extent UGA argues that it waited so long because of the pending criminal trials against the assailants, this argument also fails because: (1) the pending criminal charges did not affect UGA's ability to institute its own procedures; (2) the criminal charges were an ineffectual means to prevent future attacks at UGA while the charges were pending; and (3) the disciplinary proceedings were not instituted for another four months after Brandon Williams's acquittal and the dismissal of charges against Cole and Thomas.

Id.

The Amended Complaint alleges far more than mere delay; it alleges that the Dominican College Defendants refused to take any action, by deferring to a criminal investigation. Dominican College's failure to act in deference to the police "investigation" is no excuse for its failure to take action. See Mills Pub. Sch. Dist., OCR Case No. 01-93-1123 (Dep't of Educ. May 19, 1994) ("The District had an obligation to enact a grievance procedure which would result in prompt and equitable resolution of the sexual harassment complaints, regardless of any criminal process."); Acad. Sch. Dist. No. 20, OCR Case No. 8-93-1023 (Dep't of Educ. April 16, 1993) (holding where school district "decided to defer to the criminal investigation undertaken by the

sheriff's department" that the school district was obligated to conduct an investigation and make its own determination if a violation of Title IX has occurred notwithstanding the existence of a related criminal investigation).[7]

**D.    The Discrimination Was So Severe That It Barred Megan Wright's Access To An Educational Opportunity**

The Dominican College Defendants do not argue that the Amended Complaint is insufficient with respect to this element of Title IX.  The Amended Complaint alleges that Megan Wright faced three separate acts of sexual violation on the night of the attack.  Clearly, this conduct was severe, pervasive and objectively offensive.  See Williams, 477 F.3d at 1297-98 (finding that severe, pervasive and objectionably offensive conduct was alleged by student who was sexually molested by one student and raped by another student at the same time and in the same room immediately after she had consensual sex with a third student).  The Amended Complaint also alleges in great detail that Megan and her mother attempted to engage Dominican College administrators in a dialogue during the summer to discuss accommodations that would allow Megan to feel comfortable about attending Dominican College in the fall.  Notably, Dominican College failed to engage Megan in any meaningful discussions or take steps to ameliorate the discrimination.  Accordingly, Megan Wright could not safely return to school in the fall, where two of her three attackers were still enrolled.  See Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1248-49 (10th Cir. 1999) (holding with "little difficulty" that the allegations that due to sexual harassment, plaintiff became a danger to herself and had to leave school to be hospitalized demonstrated that plaintiff had been deprived of educational benefits).

---

[7]    These decisions of the U.S. Department of Education's Office of Civil Rights are annexed as Exhibits "E" and "A" to the accompanying Compendium of Unreported Cases.  They have been redacted by the Department of Education in response to Plaintiff's Freedom of Information Act request.  These decisions are discussed in the Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties (Jan. 2001).  The decisions and official Guidance are promulgated by the U.S. Department of Education's Office for Civil Rights and reflect the official government interpretation of Title IX.

E.     **The Amended Complaint Alleges Far More
        Than Inadequate Policies and Procedures**

Dominican College sets up another straw man by arguing that the Title IX claim should be dismissed because its alleged failure to promulgate and follow procedures is not discrimination. (Dominican Def. Br. at 5)  Dominican relies upon <u>Gebser</u> for the proposition that there is no recovery in damages for a violation of administrative requirements. (Dominican Def. Br. at 6)  As noted previously, the school district in <u>Gebser</u> had no actual knowledge of the sexual harassment of a student by a high school teacher.  The plaintiff thus attempted to establish liability by the school district's failure to "promulgate and publicize" an effective policy and grievance procedure.  <u>See Gebser</u>, 524 U.S. at 291.  The court did not address failure to "follow" procedures contrary to the Dominican College Defendants' characterization.

The <u>Gebser</u> court held that, standing alone, a "failure to promulgate a grievance procedure does not itself constitute 'discrimination.'"  <u>Id.</u> at 292.  Here, the Amended Complaint alleges far more than a failure to promulgate, and sets forth in detail Dominican College's actual knowledge and deliberate indifference.[8]

## POINT II

## THE AMENDED COMPLAINT STATES A § 1983 CLAIM

42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To state a claim under § 1983, a plaintiff must show that (1) defendants acted under color of law so as to (2) violate a federal right of the plaintiff.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144,

---

[8]     The Dominican College Defendants also argue that the Amended Complaint cannot allege Title IX against the individual administrators.  (Dominican Def. Br. at 6)  However, the Amended Complaint alleges a Title IX violation against only Dominican College.  (Am. Comp. ¶¶ 105-27)

150 (1970).  The Amended Complaint alleges both these elements against the Dominican College Defendants.

## A.  <u>Dominican College Acted Under Color Of State Law</u>

The Amended Complaint alleges two primary factors to show the Dominican College Defendants acted under color of law.  Specifically, Dominican College: (1) received federal funding (Am. Comp. ¶¶ 12, 119, 200); and (2) delegated its investigative responsibilities to the Orangetown Police department through a police detective who was also an employee of Dominican College.  (Am. Comp. ¶¶ 199, 201; <u>see id.</u> at ¶¶ 1, 6, 51, 70-71, 74-75, 77-79, 92, 123, 178)

The Dominican College Defendants argue that no § 1983 liability attaches to them without factual allegations that their conduct was "coerce[d] or encourage[d]" by the State. (Dominican Def. Br. at 16)  The Dominican College Defendants are wrong.  The Amended Complaint does not have to allege "coercion" or "encouragement" by the government.  The Amended Complaint successfully alleges that the Dominican College Defendants acted under color of law by collaborating with the local police detective to sweep reports of sexual assaults, including the attack on Megan Wright and the prior April 2006 assault, under the rug.  (Am. Comp. ¶¶ 50, 51, 79, 85, 199, 201)  These allegations of collaboration with a government actor are sufficient to allege that the Dominican College Defendants acted under color of state law. See <u>Friedman v. New York City Admin. for Children's Servs.</u>, 2005 WL 2436219 (E.D.N.Y. Sept. 30, 2005) (denying a motion to dismiss a § 1983 claim against defendant Cohen where plaintiff alleged that Cohen, a private doctor, provided the Administration for Children's Services with false and malicious information that caused curtailment of plaintiff's child visitation privileges).

The Amended Complaint clearly alleges that Defendants were "jointly engaged with state officials in the challenged action", <u>Coakley v. Jaffe</u>, 49 F.Supp 2d 615, 624 (S.D.N.Y. 1999), and thus were acting under color of law for § 1983 purposes.  <u>Id.</u>; <u>Dennis v. Sparks</u>, 449 U.S. 24 (1980); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970).  (<u>See</u> Am. Comp. ¶¶ 199, 201)  In

Coakley, the court held that plaintiff had stated a § 1983 claim against private actors based upon allegations that these defendants convinced a local assistant district attorney to conduct a "flawed investigation" that led to an alleged deprivation of plaintiff's federal rights. Coakley, 49 F.Supp.2d at 615. The court held that these allegations sufficiently set forth the element that defendants acted under color of law. Id. at 624.

The cases cited by the Dominican College Defendants to argue that their actions did not qualify as state action are plainly distinguishable. Neither Blum v. Yaretsky, 457 U.S. 991 (1982) nor Rendell-Baker v. Kohn, 457 U.S. 830 (1982) involved collaboration between a defendant and a state official, such as the Amended Complaint alleges here.[9]

## B.    Megan Wright's Federally Secured Rights Were Violated

Megan Wright had a federal right to a non-discriminatory police investigation. See Daniels v. City of Binghamton, 1998 WL 357336, at *5 (N.D.N.Y. June 29, 1998) ("Courts have recognized section 1983 equal protection claims based upon discriminatory failures by public officials to conduct proper investigations."); Eagleston v. County of Suffolk, 790 F. Supp. 416 (E.D.N.Y. 1992) (upholding § 1983 claim against police based on equal protection for failure to investigate violation of protective order reported by plaintiff); see also DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 197, n.3 (1989) (noting that the Equal Protection Clause is violated when a state selectively denies protective services to a certain disfavored minority).

Defendants violated Megan's right to equal protection when they collaborated with the Orangetown police detective to undertake a sham investigation of Megan's complaint of sexual assault. (Am. Comp. ¶¶ 42, 82, 86, 92, 98, 110, 139, 148, 175, 178, 213)

---

[9]    Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) is similarly unhelpful because the court held the private-defendants' conduct to be state action.

**C.      A § 1983 Claim Is Stated Against The Individual Dominican College Defendants**

The Amended Complaint sufficiently alleges personal involvement in the deprivation of

this right by defendants O'Brien, Prescott, Lennon and Hicks (the "Individual Defendants").  In

Back v. Hastings on Hudson Union Free School District, 365 F.3d 107 (2d Cir. 2004), a case

cited by the Defendants, the Second Circuit set forth several methods by which personal

involvement may be established under § 1983.  The Back Court explained, in pertinent part:

> Personal involvement [in a § 1983 deprivation] can be shown by:
> evidence that . . . the defendant[s], after being informed of the
> violation through a report or appeal, failed to remedy the
> wrong . . . or [] the defendant exhibited deliberate indifference . . .
> by failing to act on information indicating that unconstitutional
> acts were occurring.

Id. at 127.  The Amended Complaint alleges facts that satisfy this test:  (1) each of the Individual

Defendants is alleged to have failed to remedy the wrongs done to Megan Wright, despite their

knowledge of the tainted police investigation (Am. Comp. ¶¶ 1, 5, 8, 51, 53, 71-72, 74-49, 87,

91-96, 101-103, 199-201); and (2) each of the Individual Defendants is alleged to have exhibited

deliberate indifference to Megan Wright by taking part in the scheme to use a local police

detective to "bury" Megan's complaint of sexual harassment.  (Am. Comp. ¶¶ 51, 71, 74-79, 92,

110, 123, 178)

The cases cited by the Dominican College Defendants to support their arguments against

§ 1983 liability are inapplicable.[10]  Monell v. Dep't of Social Servs., 436 U.S. 658 (1978)

concerned the vicarious liability of municipalities for § 1983 claims under a theory of respondeat

superior and concluded that, standing alone, such theory was insufficient to create liability.

Monell required a showing that the conduct of the individuals reflected a "policy" adopted by the

municipality in order to hold the municipality vicariously liable for acts of those individuals.  Id.

---

[10]      The only other case cited in support of this argument by the Defendants, Back v. Hastings
On Hudson Union Free School District, 365 F.3d 107 (2d Cir. 2004), supports a finding
that the Amended Complaint sufficiently pleaded the Defendants' personal involvement.
Id. at 123 (finding personal involvement by defendants in employment discrimination
action when they recommended denying plaintiff tenure and evaluated plaintiff
negatively).

at 694.    The <u>Sanders v. Sears, Roebuck & Co.</u>, 984 F.2d 972 (8th Cir. 1993) decision involved a § 1983 claim asserted against the company on the basis of an act of a security guard at one of its many stores.  These cases are not remotely similar to the facts alleged here, namely that Dominican College's highest ranking administrators engaged in a pattern of conduct designed to effectively dispose of -- rather than address -- sexual harassment claims that were potentially embarrassing or harmful to the school.  <u>See</u> <u>Turpin v. Mailet</u>, 619 F.2d 196, 199-200 (2d Cir. 1980) (failure to take action on the part of those in senior policy making roles constituted "an official policy within the meaning of <u>Monell</u>") (internal quotation omitted).  (Am. Comp. ¶¶ 1, 42, 71, 74-79, 82-83, 85, 92, 98, 101, 110, 123, 175, 178, 199, 201, 213)  Finally, <u>McKinnon v. Patterson</u>, 568 F.2d 930 (2d Cir. 1978) did not involve a motion to dismiss but, rather, involved the evaluation of evidence after entry of a judgment upon trial.

## POINT III

## THE AMENDED COMPLAINT STATES A FRAUD CLAIM

To state a claim for fraud a plaintiff must allege the following elements:  (1) misrepresentation of material fact; (2) made with intent to deceive; (3) that is reasonably relied upon; and that (4) caused plaintiff's damages.  <u>P.T. Bank Central Asia v. ABN AMO Bank N.V.</u>, 301 A.D.2d 373, 376, 754 N.Y.S.2d 245, 250 (1st Dep't 2003).  A prima facie case of fraudulent concealment also requires an allegation that the defendant had a duty to disclose material information but it failed to do so.  <u>Id.</u>  The Amended Complaint satisfies each of these elements.

**A.**    **All Of The Fraud Elements Are Alleged With Sufficient Particularity**

The Dominican College Defendants seek dismissal of Plaintiff's fraud claim by -- once again -- ignoring the allegations contained in the Amended Complaint and focusing solely on the allegations concerning the April 2006 assault that occurred prior to Megan Wright's assault. However, the Amended Complaint alleges that the Dominican College Defendants fraudulently induced Megan Wright to enroll as a freshman for the 2005-2006 school year.  Accordingly, the fraud is alleged to have occurred <u>prior</u> to the April 2006 attack.  The Amended Complaint's allegations concerning the Dominican College Defendants' failure to disclose the April 2006

attack pursuant to the disclosure requirements set forth by the Clery Act do not attempt to create fraud liability under that statute. Moreover, the fraud claim is not based solely upon the non-disclosure of the April 2006 attack. Rather, the allegations regarding the Clery Act and the April 2006 attack form the basis for Ms. McGrath's information and belief regarding a fraudulent scheme directed towards prospective students that will more fully be revealed during the discovery phase of this action. See IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1057 (2d Cir. 1993). (Restating the rule that "[d]espite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.") (internal citation omitted).

The Amended Complaint alleges specific facts to support each element of its fraud claim including those alleged upon information and belief: (1) in April 2006, the month before the attack on Megan Wright, another female student was sexually assaulted in a Dominican College on-campus Residence Hall (Am. Comp. ¶ 49); (2) upon information and belief there were other attacks reported to the Dominican College Defendants (Am. Comp. ¶ 188); (3) Defendants failed to disclose any of these attacks (Am. Comp. ¶¶ 50, 53, 103, 188, 191-93); (4) information about sexual assaults on campus would have impacted the decision of prospective students, including Megan Wright, to apply for admission and enroll as students at Dominican College (Am. Comp. ¶¶ 192-93); (5) the Defendants intended to misrepresent the safety of the school's campus in order to induce students to enroll there (Am. Comp. ¶¶ 191, 193); (6) Megan Wright justifiably relied on this misrepresentation of campus safety when she decided to enroll and live on campus (Am. Comp. ¶ 194); and (7) Megan was injured as a result (Am. Comp. ¶ 196). In this manner, the Amended Complaint satisfies the requirements set forth in Fed. R. Civ. P. 9(b). See IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d at 1057.

**B.    The Defendants Had A Duty To Disclose Reported Sexual Assaults Independent Of the Clery Act**

Much of Defendants' motion wrongly rests on the argument that the only duty to report sexual assaults to the Dominican College student body and to prospective students arises from

the Clery Act and that statute specifically provides that it does not establish a standard of care or give rise to private right of action. (Dominican Def. Br. at 12-14) Defendants fail to recognize that New York law imposes on the Dominican College Defendants a duty to disclose information regarding campus crime because Defendants have superior knowledge of this essential information. This information was material to Megan's decision to attend Dominican College. It is well settled law in New York that a party, such as the Dominican College Defendants here, has a duty to speak when he: (i) possesses superior knowledge, (ii) not readily available to the other and, (iii) knows that the other is acting on the basis of mistaken knowledge. <u>See, e.g.</u>, <u>P.T. Bank Central Asia</u>, 301 A.D.2d 373, 754 N.Y.S.2d 245 (fraudulent concealment claim survived motion to dismiss because plaintiff satisfied these three elements).

The Amended Complaint alleges that the Dominican College Defendants had superior knowledge of sexual assaults occurring on campus because they, exclusively, received reports of such assaults from the victims. (Am. Comp. ¶¶ 190-91) This information was not available to Megan Wright because the school failed to disclose that information. (Am. Comp. ¶ 192)

Additionally, the Dominican College Defendants had a further distinct duty to disclose known unsafe conditions. In New York "a failure to disclose the existence of a known danger may be the equivalent of misrepresentation, where it is to be expected that another will rely upon the appearance of safety." <u>McKinney v. Bellevue Hosp.</u>, 183 A.D.2d 563, 584 N.Y.S.2d 538 (1st Dep't 1992) (citing Prosser, Torts § 33, at 179 (4th ed.)) (denying the defendant's motion to dismiss a fraud claim that was predicated on the defendant-employer's failure to inform its plaintiff-employee of a tumor found in X-rays the defendant performed on plaintiff during a pre-employment health screening).

## POINT IV

## THE AMENDED COMPLAINT STATES A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To state a claim for intentional infliction of emotional distress, a plaintiff must plead:

> (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress.

Wait v. Beck's North Am., Inc., 241 F. Supp. 2d 172, 180-81 (N.D.N.Y. 2003).

The Dominican College Defendants argue that this claim should be dismissed because it is duplicative and because it fails to allege either intent or outrageous conduct on behalf of the Dominican College Defendants. At this point of the litigation, it is uncertain whether damages to be awarded against the Dominican College Defendants under a theory of intentional infliction of emotional distress will overlap the damages to be awarded against the Dominican College Defendants for the other claims asserted in the Amended Complaint. Accordingly, the claim is not duplicative and should not be dismissed. See Bender v. City of New York, 78 F.3d 787, 793-94 (2d Cir. 1996). In Bender, the Second Circuit upheld a jury verdict awarding damages for intentional infliction of emotional distress, false arrest and malicious prosecution. That Court recognized that the damages overlapped between those causes of action, but it allowed recovery under all three claims because of the possibility that the damages did not entirely overlap. Id. at 793-95.

The Dominican College Defendants also argue that the Amended Complaint fails to allege actual intent. (Dominican Def. Br. at 8) However, the Amended Complaint alleges that the Dominican College Defendants' conduct with respect to Megan's Wright's complaint that she had been raped by three different men "was sufficiently insensitive as to intentionally cause Megan Wright to suffer severe emotional distress . . . ." (Am. Comp. ¶¶ 177, 179) Accordingly, the Amended Complaint has alleged the element of intent. See Wait v. Beck's North Am., Inc., 241 F. Supp. 2d 172, 180-81 (N.D.N.Y. 2003) (upholding intentional infliction of emotional

distress claim because plaintiff had alleged facts sufficient to apprise defendants of the nature of her claim).

The Dominican College Defendants argue that the conduct alleged in the Amended Complaint was not extreme and outrageous. (Dominican Def. Br. at 7-8) However, none of the cases cited in support of that argument involves facts even remotely similar to those present here -- where a school knowingly refuses to investigate allegations of a gang rape and directs that student to a police detective who was also a school employee. (Am. Comp. ¶¶ 199, 201; see id. at ¶¶ 1, 51, 71, 74-75, 77-79, 92, 123, 178)

The Dominican College Defendants concede that the Amended Complaint alleges several claims against them and they have not moved to dismiss these claims. Given the existence of several claims arising out of the same operative facts as the intentional infliction of emotional distress claim, dismissal of this claim at this stage of the litigation is unwarranted. See Friedman v. New York City Admin. for Children's Servs., 2005 WL 2436219, at *9 (E.D.N.Y. Sept. 30, 2005). As the court explained in Friedman:

> If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted.

Id.; see Manzi v. DiCarlo, 62 F. Supp. 2d 780 (E.D.N.Y. 1999) ("[T]here seems no question that in the long run fragmentary disposal of what is essentially one matter is unfortunate not merely for the waste of time and expense caused the parties and the courts, but because of the mischance of differing dispositions of what is essentially a single controlling issue.") (quoting Audi Vision Inc. v. RCA Mfg. Co., 136 F.2d 621, 625 (2d Cir.1943)).

## **CONCLUSION**

For all of the foregoing reasons, plaintiff Cynthia McGrath respectfully requests the Court to (1) deny the Dominican College Defendants' motion to dismiss certain claims in the Amended Complaint in its entirety; and (2) award such further relief as this Court deems proper. In the alternative, Plaintiff Cynthia McGrath respectfully requests leave to further amend the complaint to correct any deficiencies identified by the Court in connection with this motion.

Dated:   New York, New York
          March 17, 2008

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP

By:_____
     Andrew L. Morrison (AM-1071)
     andrew.morrison@klgates.com
     Sarah P. Kenney (SK-5642)
     sarah.kenney@klgates.com
599 Lexington Avenue
New York, New York  10022
212-536-3900
Attorneys for Plaintiff

- 25 -

Andrew L. Morrison (AM-1071)
Sarah P. Kenney (SK-5642)
KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
212-536-3900

Attorneys for Plaintiff
Cynthia McGrath, individually and as
Administratrix Ad Prosequendum of the Estate
of Megan Wright, Deceased, and as General
Administratrix of the Estate of Megan K.
Wright Deceased

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

CYNTHIA McGRATH, INDIVIDUALLY AND AS          :
ADMINISTRATRIX AD PROSEQUENDUM OF THE              07 Civ. 11279 (SCR)(GAY)
ESTATE OF MEGAN K. WRIGHT, DECEASED, AND      :
AS GENERAL ADMINISTRATRIX OF THE ESTATE
OF MEGAN K. WRIGHT, DECEASED,                 :

                        Plaintiff,            :


       - against -                            :


DOMINICAN COLLEGE OF BLAUVELT,                :    **COMPENDIUM OF**
NEW YORK, SISTER MARY EILEEN O'BRIEN,              **UNREPORTED CASES**
INDIVIDUALLY AND AS PRESIDENT OF              :
DOMINICAN COLLEGE, JOHN LENNON,
INDIVIDUALLY AND AS DIRECTOR OF              :
SECURITY OF DOMINICAN COLLEGE, JOHN
PRESCOTT, INDIVIDUALLY AND AS DEAN OF         :
STUDENTS OF DOMINICAN COLLEGE, CARLYLE
HICKS, INDIVIDUALLY AND AS DIRECTOR OF        :
RESIDENT LIFE OF DOMINICAN COLLEGE,
RICHARD FEGINS, JR., KENNETH A. THORNE, JR.,  :
ISAIAH LYNCH, and TERRELL E. HILL,
                                              :
                        Defendants.
                                              :
-----------------------------------------------------------------------X

| Exhibit | Case[1] |
|---------|---------|
| A | Acad. Sch. Dist. No. 20, OCR Case No. 8-93-1023 (Dep't of Educ. April 16, 1993) |
| B | Aspex Eyewear, Inc. v. Clariti Eyewear, Inc., 2008 WL 219765 (S.D.N.Y. Jan. 24, 2008) |
| C | Daniels v. City of Binghamton, 1998 WL 357336 (N.D.N.Y. June 29, 1998) |
| D | Friedman v. New York City Admin. for Children's Servs., 2005 WL 2436219 (E.D.N.Y. Sept. 30, 2005) |
| E | Mills Pub. Sch. Dist., OCR Case No. 01-93-1123 (Dep't of Educ. May 19, 1994) |

Dated:   New York, New York
         March 17, 2008

                        KIRKPATRICK & LOCKHART PRESTON
                        GATES ELLIS LLP

                        By: _____
                             Andrew L. Morrison (AM-1071)
                             andrew.morrison@klgates.com
                             Sarah P. Kenney (SK-5642)
                             sarah.kenney@klgates.com
                        599 Lexington Avenue
                        New York, New York  10022
                        212-536-3900
                        Attorneys for Plaintiff

---

[1]    The redactions in Exhibits "A" and "E" were made by the United States Department of Education in response to Plaintiff's Freedom of Information Act request.

# **<u>EXHIBIT A</u>**

APR 16 1993

Re:   08931023

Dr. Thomas Crawford
Superintendent
Academy School District # 20
7610 North Union Boulevard
Colorado Springs, Colorado  80920

Dear Dr. Crawford:

The U.S. Department of Education, Office for Civil Rights (OCR) has completed its investigation of the complaint filed against Academy School District # 20 (District), a recipient of Federal financial assistance from the U.S. Department of Education.  The complainants alleged that the District discriminated against their ▉▉▉▉ (b)7c on the basis of sex by permitting her to be sexually harassed and by failing to adequately respond when the complainants brought charges of harassment to its attention.

The complaint was investigated pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. Sections 1681, 1682, and its implementing regulation, Title 34, Code of Federal Regulations (C.F.R.), Part 106, which prohibit discrimination on the basis of sex in programs or activities receiving Federal financial assistance from the U.S. Department of Education.

During this investigation, OCR examined pertinent documents and interviewed the complainants, ▉▉▉ and District faculty, staff, and (b)7c administrators.  This letter serves to advise you officially of our conclusions.

Background

According to the complainants, during school year 1991-92, on numerous occasions, two fifth grade boys directed sexually explicit language at ▉▉ while the three students were waiting at the school (b)7c bus stop.  The complainants alleged that, from October 1991 to March 1992, they made several complaints regarding the verbal harassment of ▉▉ to the Edith Wolford Elementary School principal (b)7c and various staff members but, no adequate measures were taken to address the situation.

The complainants further alleged that in June 1992 the incidents escalated to the point where one of the boys sexually assaulted ▉▉ (b)7c (touched and kicked her in the breast and vaginal areas) and

Dr. Thomas Crawford - Page 2

threatened her with a gun and a knife at the school bus stop. On June 19, 1992, upon learning of these incidents, the complainants notified the sheriff's department, which conducted a criminal investigation. On June 30, 1992, the complainants notified the District of their allegations. In October 1992, the sheriff's department determined that it was unable to confirm any allegations of sexual impropriety by the two male students. ███ is no longer (b)7c attending Wolford Elementary School.

The Title IX regulation at 34 C.F.R. Section 106.31(a) provides that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic or other education program or activity. The regulation at 34 C.F.R. Section 106.31(b) prohibits a recipient from treating an individual differently from another in the provision of services, providing services in a different manner, denying services, subjecting an individual to separate or different rules of behavior or limiting an individual's enjoyment of any right, privilege, advantage or opportunity on the basis of sex. Sexual harassment is a form of disparate treatment. Sexual harassment includes verbal or physical conduct of a sexual nature, imposed on the basis of sex.

A recipient has an obligation to provide a nondiscriminatory educational environment. A recipient cannot satisfy this obligation if the conduct of individuals who are part of the educational setting, including students, creates a hostile sexual environment, _i.e._, acts of a sexual nature that are sufficiently severe, pervasive, or persistent to create an intimidating or offensive environment that disrupts the educational mission of the educational institution.

The Title IX regulation, at 34 C.F.R. Section 106.8, also provides that a recipient must adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints that allege any action that would be a violation of Title IX.

District Policies and Procedures

The District provided OCR its "Handbook of Student Rights and Responsibilities," which parents receive when they initially enroll their children in the District's schools. The handbook advises the reader to contact the District's Coordinator of Personnel Services to report a complaint.

The District also provided a copy of Policy 5117, which includes procedures to be followed in instances of alleged harassment by a student directed towards another student. According to the policy,

Dr. Thomas Crawford - Page 3

individuals who are physically assaulted or threatened with physical assault should contact a building or central office administrator, who has the responsibility to immediately communicate with the superintendent or his designee. The Board of Education is then informed of the incident. The student, teacher, or employee is to then file a written complaint with the principal or immediate supervisor, the superintendent's office, and the Board of Education. If adequate proof of the charges is obtained after an investigation, the student will be suspended for a minimum of three days. According to the policy, the incident is then to be reported to the district attorney or the appropriate local law enforcement agency or officer who will investigate the incident to determine the appropriateness of filing criminal charges or initiating delinquency proceedings.

The District also has a Student Complaint Procedure (Administrative Procedure 7019.1) and a Student Complaint Form (Policy 7019, Appendix), which a student may use for any complaint alleging a violation of Title IX. Although the procedure states that a complaint must be submitted on the official complaint form, the principal stated in his interview with OCR that he would investigate any complaint he received.

<u>Verbal abuse during 1991-92 school year:</u>

During the 1991-92 school year, the complainants allegedly spoke to the principal, the Director of Elementary Education, and the teachers on their son's IEP staffing team about the two boys at the bus stop and their use of inappropriate language. In March 1992, they stated that they also told the Director of Elementary Education about the problem. ▆ stated that she did not tell the (b)7c bus driver or any of her teachers about the verbal harassment.

In their interviews with OCR, the principal, the former Director of Elementary Education, and the teachers on the complainants' son's IEP staffing team denied having discussed with the complainants the verbal sexual harassment of ▆ at the bus stop. Moreover, the bus (b)7c driver stated he was unaware of any verbal sexual abuse directed at RM. OCR also interviewed ▆ third grade teacher, physical (b)7c education teacher, and music teacher. No one was aware that ▆ was (b)7c being subjected to verbal sexual harassment at the bus stop.

The District is only required to respond to known complaints of sexual harassment. OCR could not establish that the District was ever notified of the alleged sexual harassment of ▆ during the (b)7c 1991-92 school year.

Dr. Thomas Crawford - Page 4

<u>Abuse in June 1992</u>:

On June 30, 1992, the complainants informed the Superintendent's office that two male students made sexually explicit language comments to ▮, sexually molested her, and threatened her with a gun and a knife at the bus stop. The complainants also contacted the principal of Wolford Elementary on the same day. Both the superintendent's office and principal were told that the sheriff's department was investigating the matter. The District did not, then or later, initiate an investigation of the complaint. (b)7c

In her interview with OCR, ▮ was unable to clearly articulate what occurred. OCR reviewed the sheriff's department report, which included interview statements with ▮, the two male students, and the bus driver. While ▮ detailed the incidents of harassment to the sheriff's department during three interviews, she was unable to provide that department or OCR specific dates of when the alleged incidents occurred. According to the sheriff's department report, the two male students denied ever verbally harassing, kicking, touching or shoving ▮. Both also denied ever threatening ▮ with a gun or a knife. According to his interview statement with OCR and the sheriff's department, the bus driver reported being unaware of any such incidents. (b)7c

OCR next sought to determine whether the District adequately responded to the complaint of sexual harassment that was presented to them. Although the District's Policy 5117 provides that an investigation will be undertaken in instances of alleged harassment by a student directed toward another student, and the District's grievance procedure provides for the resolution of complaints alleging violations of Title IX, the District decided to defer to the criminal investigation being undertaken by the Sheriff's Department. Even after that criminal investigation was completed, the District still took no action with respect to the complaint.

According to the District, under Colorado state law, a law enforcement agency has the authority to conduct an investigation when there are charges of child abuse, sexual or otherwise and according to the District's attorney, if no school personnel are accused, the District will not investigate allegations of sexual abuse and will defer to the Department of Social Services or a law enforcement agency.

Although other agencies may undertake criminal investigations of sexual harassment charges, where a complaint is brought to the District alleging actions which, if true, could also constitute a violation of Title IX, the District remains obligated to conduct an investigation and make its own determination if a violation of Title IX has occurred. Because it failed to do so, we have determined that the District violated 34 C.F.R. § 106.8 (b).

Dr. Thomas Crawford - Page 5

Additional Finding

The Title IX regulation and Title II of the Americans with Disabilities Act, at 28 C.F.R. Section 35.107, provide that a recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by these parts. The Section 504 regulation, at 34 C.F.R. Section 104.7 provides that a recipient that employs fifteen or more persons shall adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited by this part.

During OCR's review of the District's grievance procedure, we determined that while the procedure provides time frames for each stage of the grievance process, the appeals process at the superintendent's level does not have such a time frame. The grievance procedure does not include a statement providing for the prompt and equitable resolution of complaints. Absent such a statement or some other comparable commitment, OCR cannot determine that this level of the grievance process will be completed promptly.

OCR therefore concludes that the District violated 34 C.F.R. § 104.7(b), 28 C.F.R. § 35.107(b), and 34 C.F.R. § 106.8(b).

The District submitted a corrective action plan (copy enclosed) which contains provisions sufficient to correct the cited violations. For this reason, OCR is closing this case effective the date of this letter.

This letter addresses only the issues listed above and should not be interpreted as a determination of the District's compliance or noncompliance with Title IX, Section 504, or the ADA in any other respect. Continued compliance is contingent upon the District implementing the provisions of the corrective action plan. Failure to perform the actions in question may result in a finding of violation. As is OCR's standard practice, compliance with commitments and assurances will be monitored; accordingly, we request that you submit periodic updates on your progress in implementing the corrective action plan, as specified therein. The first report should be submitted by June 1, 1993.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, we will seek to protect, to the extent provided by law, personal information which, if released, could constitute an unwarranted invasion of privacy.

Dr. Thomas Crawford - Page 6

We thank you and your staff, especially Ms. Kathleen Crume, for the cooperation extended to OCR's staff throughout the course of the investigation.  If you have any questions, you may call me at (303) 844-5695, or Ms. Nancy L. Haberkorn, Director, Compliance Enforcement Division I, at (303) 844-2991.

                              Sincerely,


                              Cathy H. Lewis
                              Regional Director

Enclosure

cc:  Honorable William T. Randall
     Commissioner of Education

     Ms. Kathleen Crume
     Personnel Director

FROM:SUPT                    TO:          3038444303     APR 16· 1993  1:02PM  #498  P.01



## School District Number Twenty

*Administration Office*                                    Phone 719-598-2566
                                                          FAX 719-598-9534

7610 NORTH UNION BOULEVARD        •        COLORADO SPRINGS, CO 80920-3699

Thomas E. Crawford, Ed.D., Superintendent of Schools

### CORRECTIVE ACTION AGREEMENT

Concerning complaint number 08931023 against the Academy School District #20 (District) and following an investigation by the U.S. Department of Educaton, Office for Civil Rights (OCR), under the authority granted by Section 504 of the Rehabilitation Act of 1973 (Section 504), Title II of the Americans with Disabilities Act (ADA or Title II), and Title IX of the Education Amendments of 1972 (Title IX), the District agrees to take the following corrective actions:

1.  Regarding formal or informal complaints alleging violations of Title IX (e.g., sexual harassment allegations involving students), the District will ensure that is shall investigate all complaints. [See 34 C.F.R. §§ 106.8 (b), 106.31]

    OCR will monitor, for a minimum of one year, Edith Wolford Elementary School's investigation of any sexual harassment complaints (formal and informal) involving students of which it is notified. The District will submit to OCR, upon notification of a sexual harassment complaint, documentation that the complaint was investigated.

2.  The District will modify its grievance (complaint) procedure for Section 504, ADA, and Title IX complaints so it incorporates appropriate due process standards and provides for prompt and equitable resolution of all complaints, in accordance with 34 C.F.R. § 104.7 (b), 28 C.F.R. §35.107 (b), and 34 C.F.R. § 106.8 (b).

    The District's grievance (complaint) procedures will be modified and implemented by June 1, 1993. A copy of the modified procedures will be provided to OCR by June 1, 1993.

_____                    4-16-'93
Academy School District #20                  _____
                                             Date

Post-It™ brand fax transmittal memo 7671  | # of pages ▸ | 1
To Diane Shay                              | From Kathleen Brune
Co. OCR                                    | Co. I.D. 20
Dept.                                      | Phone # 598-2566
Fax # 303-844-4303                         | Fax # (719) 598-9534

# EXHIBIT B

Westlaw.

531 F.Supp.2d 620                                                    Page 1
531 F.Supp.2d 620
**(Cite as: 531 F.Supp.2d 620)**

Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
ASPEX EYEWEAR, INC. and Contour Optik, Inc.,
Plaintiffs,
v.
CLARITI EYEWEAR, INC., Defendant.
**No. 07 Civ. 2373(DC).**

Jan. 24, 2008.

**Background:** Patentees brought infringement action
against alleged infringer of patents relating to
magnetic frames and clip-on attachments for
eyeglasses. Patentee moved to strike certain
affirmative defenses and moved to strike certain
counterclaims and alleged infringer moved to dismiss
complaint in its entirety.

**Holdings:** The District Court, Chin, J., held that:
(1) patentees' complaint satisfied notice pleading
requirements, and
(2) Alleged patent infringer's counterclaims and
affirmative defenses failed to meet the minimal
requirements of notice pleading.

Plaintiffs' motions granted; defendant's motion
denied.

**[1] Federal Civil Procedure 170A €══1772**

170A Federal Civil Procedure
  170AXI Dismissal
    170AXI(B) Involuntary Dismissal
      170AXI(B)3 Pleading, Defects In, in
General
        170Ak1772 k. Insufficiency in General.
Most Cited Cases
The question, in deciding a motion to dismiss for
failure to state a claim, is whether the pleading
alleges enough facts to state a claim for relief that is
plausible on its face. Fed.Rules Civ.Proc.Rule
12(b)(6), 28 U.S.C.A.

**[2] Patents 291 €══310.1(5)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k309 Pleading
        291k310.1 Original Bill
          291k310.1(5) k. Infringement and
Injury, Loss or Damage. Most Cited Cases
Patentees' complaint against alleged infringer told
alleged infringer which claims of the patents-in-suit
were infringed and which particular products
supposedly infringed the patents, as to satisfy notice
pleading requirements under Federal Rules of Civil
Procedure, by alleging alleged infringer sold
eyeglasses designated as "AirMag," which had
"magnetic frames and clip-on attachments" as
claimed in patentees' patents, and that patentees
owned two valid patents and had not granted alleged
infringer right to manufacture or sell the patent-
infringing eyeglasses. Fed.Rules Civ.Proc.Rule 8(a),
28 U.S.C.A.

**[3] Patents 291 €══310.7(4)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k309 Pleading
        291k310.7 Plea and Answer
          291k310.7(4) k. Answer in General.
Most Cited Cases

**Patents 291 €══310.7(5)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k309 Pleading
        291k310.7 Plea and Answer
          291k310.7(5) k. Counterclaim in
Answer. Most Cited Cases
Alleged patent infringer's counterclaims and
affirmative defenses alleging that the patentees'
patents were invalid and/or unenforceable, as well as
its affirmative defenses of collateral estoppel and/or
res judicata, equitable estoppel, and patent misuse
and/or unclean hands failed to meet the minimal
requirements of notice pleading under Federal Rules

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

531 F.Supp.2d 620
531 F.Supp.2d 620
(Cite as: 531 F.Supp.2d 620)

Page 2

of Civil Procedure, as alleged infringer merely asserted these claims and defenses without alleging any facts to support them or even referring to the elements of the various affirmative defenses. Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⟳751**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(C) Answer
         170AVII(C)2 Affirmative Defense or Avoidance
            170Ak751 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ⟳771**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(C) Answer
         170AVII(C)3 Set-Offs, Counterclaims and Cross-Claims
            170Ak771 k. In General. Most Cited Cases
Mere conclusory assertions are not sufficient to give plaintiffs notice of the counterclaims and affirmative defenses and, thus, do not meet notice pleading standards under the Federal Rules of Civil Procedure. Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

**Patents 291 ⟳328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases

**Patents 291 ⟳328(4)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(4) k. Reissue. Most Cited Cases
6,109,747. Cited.

37,545. Cited.

Collen Intellectual Property Law, P.C. by Jess M. Collen, Esq., Jeffrey A. Lindenbaum, Esq., Matthew Clifton Wagner, Esq., Ossining, NY, Lerner, David, Littenberg, Krumholz & Mentlik, LLP by Russell William Faegenburg, Esq., Steven Louis Procaccini, Esq., Westfield, NJ, for Plaintiffs.
Mintz Levin Cohn Ferris Glovsky & Popeo, P.C. by Kevin N. Ainsworth, Esq., Seth Robert Goldman, Esq., New York City, for Defendant.

*MEMORANDUM DECISION*

CHIN, District Judge.
On March 22, 2007, plaintiffs Aspex Eyewear, Inc. and Contour Optik, Inc. filed a complaint against defendant Clariti Eyewear, Inc. ("Clariti"), asserting two patent infringement claims. In its answer filed on May 18, 2007, Clariti denied the allegations of patent infringement, raised sixteen affirmative defenses, and asserted counterclaims against plaintiffs for a declaratory judgment that it has not infringed plaintiffs' patents and that the patents are invalid and/or unenforceable.

Plaintiffs move to strike certain affirmative defenses pursuant to Federal Rule of Civil Procedure 12(f) and to dismiss certain counterclaims pursuant to Rule 12(b)(6). Clariti also moves to dismiss plaintiffs' complaint in its entirety. For the reasons set forth below, plaintiffs' motion to strike certain affirmative defenses and dismiss certain counterclaims is granted, and Clariti's motion to dismiss the complaint is denied.

*DISCUSSION*

**a.** *Motion to Dismiss Standard*

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the non-moving party as true and draw all reasonable inferences in its favor. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996); *see Erickson v. Pardus,* --- U.S. ----, ----, 127 S.Ct. 2197, 2199, 167 L.Ed.2d 1081 (2007) (per curiam); *Bell Atl. Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

531 F.Supp.2d 620
531 F.Supp.2d 620
**(Cite as: 531 F.Supp.2d 620)**

Page 3

[1] In its recent decision in *Bell Atlantic Corp.,* the Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language from *Conley v. Gibson,* 355 U.S. 41, 45-47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), adopting in its place a "plausibility" requirement. *Bell Atl. Corp.,* 127 S.Ct. at 1969.As interpreted by the Second Circuit, *Bell Atlantic Corp.* did not announce a "universal standard of heightened fact pleading, but ... instead requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007). The question is whether the pleading alleges "'enough facts to state a claim for relief that is plausible on its face.'"*Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007) (quoting *Bell Atl. Corp.,* 127 S.Ct. at 1974).

In deciding a motion to dismiss, a court may consider the pleadings and attached exhibits, statements, or documents incorporated by reference, and matters subject to judicial notice. *See Prentice v. Apfel,* 11 F.Supp.2d 420, 424 (S.D.N.Y.1998) (citing *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993))." '[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations' " and will not defeat the motion. *Gavish v. Revlon, Inc.,* No. 00 Civ. 7291(SHS), 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) (quoting *Citibank, N.A. v. Itochu Int'l, Inc.,* No. 01 Civ. 6007(GBD), 2003 WL 1797847, at *1 (S.D.N.Y. April 4, 2003)).

The standard on a motion to dismiss also applies to a motion to dismiss a counterclaim pursuant to Rule 12(b)(6) and a motion to strike an affirmative defense pursuant to Rule 12(f).*See FSP, Inc. v. Societe Generale,* No. 02 Civ. 4786(GBD), 2005 WL 475986, at *7-8 (S.D.N.Y. Feb. 28, 2005).

**b. *Clariti's Motion to Dismiss Complaint***

[2] Clariti moves to dismiss plaintiffs' complaint in its entirety for failure to comply with Rule 8(a)'s pleading requirements. It argues that "the Complaint does not tell Clariti which claims of the patents-in-suit are infringed[, nor] does the Complaint tell Clariti which particular products supposedly infringe."(Def. Mem. at 2). This argument is rejected because the Complaint does allege that defendant

sold eyeglasses designated as "AirMag," which had "magnetic frames and clip-on attachments" as claimed in plaintiffs' ' 747 and '545 patents. (Compl.¶¶ 12, 21). Plaintiffs also allege that they own two valid United States patents (*id.* ¶¶ 9-10, 19) and that they have not granted defendant the right to manufacture or sell the patent-infringing eyeglasses (*id.* ¶¶ 13, 22). These allegations are sufficient to support claims for patent infringement. *See Agilent Techs., Inc. v. Micromuse, Inc.,* No. 04 Civ. 3090(RWS), 2004 WL 2346152, at *4 (S.D.N.Y. Oct. 19, 2004).* Accordingly, Clariti's motion to dismiss the complaint is denied.

**c. *Plaintiffs' Motion to Strike and Dismiss***

Plaintiffs seek to dismiss the counterclaims alleging that their patents are invalid and/or unenforceable (*see* Answer ¶¶ 9, 13), and to strike the affirmative defenses that are identical to these counterclaims (*see id.* ¶¶ 24, 28). Plaintiffs also seek to strike the affirmative defenses of collateral estoppel and/or res judicata, equitable estoppel, and patent misuse and/or unclean hands. (*See id.* ¶¶ 32, 37, 38). The main ground for their motion to dismiss the counterclaims and strike the affirmative defenses is that Clariti has alleged no set of facts to put them on notice of the counterclaims and defenses asserted against them. *See*Fed.R.Civ.P. 8(a).

Counterclaims, like claims, are subject to Rule 8(a)'s pleading requirements. *Management Assistance Inc. v. Edelman,* 584 F.Supp. 1016, 1020 (S.D.N.Y.1984). The Second Circuit has likewise held that "[a]ffirmative defenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy."*Shechter v. Comptroller of New York,* 79 F.3d 265, 270 (2d Cir.1996) (quoting *Nat'l Acceptance Co. of Am. v. Regal Prods., Inc.,* 155 F.R.D. 631, 634 (E.D.Wis.1994) ("affirmative defenses are pleadings, and therefore, are subject to all pleading requirements of the Federal Rules of Civil Procedure")) (internal quotations and citations omitted).

[3][4] Clariti's counterclaims and affirmative defenses alleging that the '747 and '545 patents are invalid and/or unenforceable, as well as its affirmative defenses of collateral estoppel and/or res judicata, equitable estoppel, and patent misuse and/or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

531 F.Supp.2d 620
531 F.Supp.2d 620
**(Cite as: 531 F.Supp.2d 620)**

Page 4

unclean hands fail to meet the minimal requirements of notice pleading under Fed.R.Civ.P. 8(a). Clariti merely asserts these claims and defenses without alleging even general facts to support them. In fact, Clariti asserts *no* facts, nor does Clariti even refer to the elements of the various affirmative defenses. Mere conclusory assertions are not sufficient to give plaintiffs notice of the counterclaims and defenses and, thus, do not meet Rule 8(a)'s pleading standards. *See Takeda Chem. Indus., Ltd. v. Alphapharm Pty, Ltd.,* No. 04 Civ.1966(DLC), 2004 WL 1872707 (S.D.N.Y. Aug. 19, 2004). Accordingly, plaintiffs' motion to strike certain affirmative defenses and dismiss certain counterclaims is granted.

### CONCLUSION

For the reasons set forth above, Clariti's motion to dismiss the complaint is denied. Plaintiffs' motion to strike the affirmative defenses of collateral estoppel and/or res judicata, equitable estoppel, and patent misuse and/or unclean hands and to dismiss Clariti's counterclaims and strike its affirmative defenses that the '747 and '545 patents are invalid and/or unenforceable is granted, without prejudice to repleading within ten days hereof.

SO ORDERED.

S.D.N.Y.,2008.
Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.
531 F.Supp.2d 620

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.                                                                          Page 1
Not Reported in F.Supp., 1998 WL 357336 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

▷Daniels v. City of Binghamton
N.D.N.Y.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
Foster DANIELS, Plaintiff,
v.
CITY OF BINGHAMTON, NY; Gerald Mollen,
Broome County District Attorney; Joseph D. Lynch,
Chief of Police, Binghamton, N.Y. Police Dept.; Cpt.
Joseph T. Zikuski, P.O. Martin Burnett, P.O. Michael
Talbut, P.O. Terrance Heslin, P.O. Dennis Gorman,
Sgt. Eggleston, Police Officers of the Binghamton,
N.Y. Police Dept., Defendants.
**No. 3:95-CV-688.**

June 29, 1998.

Stone and Stone, Vestal, for Plaintiff; Michelle E.
Stone, Esq.
Broome County Attorney, Edwin L. CrawfordCounty
Office Building, Binghamton, for Defendant Gerald
Mollen, William L. Gibson, Jr., Esq. , Of Counsel.

MEMORANDUM, DECISION & ORDER

MCAVOY, Chief District J.
**\*1** This civil rights action arose out of plaintiff Foster
Daniels' confrontation with various members of the
Binghamton Police Department ("BPD") on February
20, 1994. Plaintiff brings several constitutional
claims under 42 U.S.C. §§ 1981 and 1983, alleging
that various members of the BPD violated his rights
under the Fourth and Fourteenth Amendments.

Defendant Gerald Mollen now moves for summary
judgment dismissing the Complaint.

I. BACKGROUND

A. Facts:

On the night of February 20, 1994, plaintiff's 15 year
old daughter was walking home with three friends on
Main Street in downtown Binghamton, New York.
(8/26/94 Jones FN1 Aff. ¶ 2; 4/6/98 Stone FN2 Aff. Ex.
1-Broome Cty. Dist. Atty. Investigation Report). At
some point, the four were confronted outdoors by a

patron of a bar nearby. (8/26/94 Jones Aff. at ¶¶ 9-14;
4/6/98 Stone Aff. Ex. 1). Plaintiff, a black male, was
inside his apartment at 194 Main Street when he was
told that a man was verbally abusing and racially
harassing his daughter in front of his residence.
(Pl.2d Am.Compl.¶ 11). Plaintiff picked up two
hammers and proceeded outside where he was met by
a gathering of several civilians and off-duty police
officers, also patrons of the bar. (8/19/94 Pl. Aff. ¶ 5).
Plaintiff then was joined by two acquaintances, one
of whom was brandishing a knife and the other a
large stick. (6/21/96 Zikuski Aff. ¶ 5; 8/26/94 Jones
Aff. ¶ 17). A civilian stepped towards plaintiff and
plaintiff struck the civilian across the face with a
hammer. (6/21/96 Zikuski Aff. ¶ 8; 4/6/98 Stone Aff.
Ex. 1).

> FN1. Frank Jones was one of the three
> friends with plaintiff's daughter on the night
> of the incident. He is also the man with the
> stick who was later arrested along with
> Daniels.

> FN2. Michelle E. Stone is plaintiff's
> attorney.

Several civilians and off-duty police officers
attempted to subdue and arrest plaintiff. (4/6/98
Stone Aff. Ex. 1). The confrontation began on the
street, but ended with plaintiff in handcuffs inside his
apartment. (6/21/96 Zikuski Aff. ¶¶ 11-12). Several
of the individuals involved were injured during the
incident and taken to the hospital. (Id. ¶¶ 13-14;
4/6/98 Stone Aff. Ex. 1). Plaintiff alleges that during
the incident, the gathered crowd of civilians and off-
duty police officers hurled racial slurs and epithets at
him. (Pl.2d Am. Compl. ¶ 18; see 9/8/94 Van Scoy
FN3 Aff. ¶¶ 8-9, 16, 20, 26; 8/26/94 Jones Aff. ¶ 28).
He further alleges that the defendant police officers
used excessive force when arresting him. (Pl.2d
Am.Compl.¶¶ 19-22, 24-25). Specifically, plaintiff
asserts that he was struck by a shopping cart, was
repeatedly hit about the face and body with fists, was
chased back into his apartment, had his door beaten
down, was tackled and placed in handcuffs, and was
continuously beaten about the head and body by the
off-duty officers.(Id.). Plaintiff and the men with the
knife and stick were all arrested and charged with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 357336 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

assault. (4/9/98 Stone Aff. Ex. 1).

> FN3. Bradley Van Scoy was a resident of 194 Main Street, Apt. 8 on the night of the incident.

Plaintiff further alleges that various members of law enforcement, including defendants, later engaged in a "cover-up" of the events that occurred on February 20, 1994. Plaintiff specifically alleges that Mollen, the Broome County District Attorney, with discriminatory intent, failed to: 1) investigate allegations of aggression by the crowd outside plaintiff's home; 2) investigate whether the crowd shouted racial slurs at plaintiff; 3) investigate the identity of a man who allegedly grabbed plaintiff; or 4) interview any possible witnesses at neighboring businesses. (Pl.2d Am.Compl.¶ 41). As a result of Mollen's conduct, plaintiff asserts that he "was unfairly and unlawfully prosecuted, convicted, and jailed" for two counts of Assault in the Second Degree under section 120.05 of the New York State Penal Law, a Class D felony. (Id. ¶ 43). Plaintiff pleaded guilty to the charges.

*2 Broadly construed, plaintiff's complaint asserts section 1983 claims against Mollen sounding in malicious prosecution, false imprisonment, and racial discrimination in violation of plaintiff's Fourth and Fourteenth Amendment rights. Plaintiff also brings a claim pursuant to 42 U.S.C. § 1981.

B. Procedural History:

Plaintiff filed an initial complaint pro se with this Court on May 19, 1995, and the matter was referred to Magistrate Judge David N. Hurd. Defendants City of Binghamton, Bucci, Zikuski, Heslin, Talbut, Burnett, Gorman, and Lynch appeared by filing an answer and counterclaims on July 5, 1995. Numerous motions and amendments followed. On February 5, 1997, Plaintiff was appointed counsel Allen and Michelle Stone, who were later permitted to file a Second Amended Complaint which named the above-captioned defendants.

On April 20, 1998, Mollen filed the present motion for summary judgment under Fed.R.Civ.P. 56, or alternatively, to dismiss the complaint for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6).

II. DISCUSSION

A. Standard for Summary Judgment

Federal Rule of Civil Procedure 12(b) states that if on a 12(b)(6) motion "to dismiss for failure to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."Both parties have submitted matters outside the pleadings on this motion. Based upon these submissions, and the fact that plaintiff was on notice that this motion was in the alternative for summary judgment, the Court will treat this motion as one for summary judgment.

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate only when "there is no genuine issue as to any material fact and .... the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). Once the moving party has established that no genuine question of material fact exists, the burden shifts to the non-movant to come forward with "specific facts showing that there is a genuine issue for trial."Fed.R.Civ.P. 56(e). The non-movant cannot rest upon "mere allegations or denials" asserted in his pleadings. Id.; see Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir.1994) (failing to support contentions with competent evidence cannot create issues of fact capable of defeating valid motion for summary judgment). Rather, the opposing party must present "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Absent such a showing, summary judgment will be granted.

"[C]onclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir.1990) (quoting Anderson, 477 U.S. at 252);see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), cert. denied,500 U.S. 928 (1991). Moreover, "[t]he non-movant cannot escape summary judgment merely by vaguely asserting the

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 357336 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

existence of some unspecified disputed material fact, or defeat the motion through mere speculation or conjecture." _Western World Ins. Co. v. Stack Oil, Inc.,_ 922 F.2d 118, 121 (2d Cir.1990).

\*3 Of course, it is well-established that in deciding a motion for summary judgment, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. _Cruden v. Bank of New York,_ 957 F.2d 961, 975 (2d Cir.1992); _Ramseur v. Chase Manhattan Bank,_ 865 F.2d 460, 465 (2d Cir.1989). Further, it is equally well-settled that "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." _Bryant v. Maffucci,_ 923 F.2d 979, 982 (2d Cir.1991), _cert. denied,_ 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

With this standard in mind, the Court turns to Mollen's motion.

B. Plaintiff's Claims Against Mollen under 42 U.S.C. §§ 1981 and 1983.

1. Prosecutorial Immunity

Plaintiff has alleged misconduct on the part of Mollen in two respects. First, plaintiff asserts that Mollen conducted a racially discriminatory investigation causing him to be maliciously prosecuted and falsely imprisoned in violation of the Fourth and Fourteenth Amendments. Second, plaintiff alleges that Mollen failed to conduct a proper investigation into plaintiff's allegations of illegal conduct by BPD police officers, violating plaintiff's right to equal protection of the laws under the Fourteenth Amendment and section 1981.

Mollen first argues that he is entitled to absolute immunity with respect to any allegations that arose after the criminal proceeding had been initiated against plaintiff. "It is well established that a state prosecutor is absolutely immune from a civil suit for damage under 42 U.S.C. § 1983 when the challenged activities were an integral part of the judicial phase." _Rodriguez v. Hynes,_ 1995 WL 116290, at \*2 (E.D.N.Y.) (citing _Imbler v. Pachtman,_ 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); _Day v. Morgenthau,_ 909 F.2d 75, 77 (2d Cir.1990)). The Second Circuit has held that a claim of malicious prosecution, as well as claims related to plea

agreements, are within the judicial phase of a criminal prosecution, thus entitling a District Attorney to absolute immunity for actions taken in this respect. _Pinaud v. County of Suffolk,_ 52 F.3d 1139, 1149 (2d Cir.1995); _Hill v. City of New York,_ 45 F.3d 653, 661 (2d Cir.1995); _Day,_ 909 F.2d at 77. Therefore, Mollen's motion for summary judgment on the section 1983 malicious prosecution claim must be granted.[FN4]

> FN4. This analysis applies to plaintiff's section 1981 claim as well. When a prosecutor is immune under section 1983, he is likewise immune from liability under 42 U.S.C. § 1981. _See, e.g., An-Ti Chai v. Michigan Technological University,_ 493 F.Supp. 1137, 1148-50 (W.D.Mich.1980) (holding that parties with immunity under section 1983 should retain that immunity under section 1981); _see also Santiago v. New York State Dep't. Of Correctional Services,_ 725 F.Supp. 780, 783 (S.D.N.Y.1989) (finding identical meaning in the term "person" among various sections of the Civil Rights Act of 1871, as revised, comparing specifically § 1983 and § 1985).

It is equally well-established, however, that prosecutors are not absolutely immune from liability when engaged in conduct outside the scope of their official roles, when engaged in administrative activities, or when conducting investigations. When prosecutors engage in conduct that is beyond the scope of their official duties, they are not immune from liability at all. _See, e.g., Jones v. Clinton,_ 520 U.S. 681, ----, 117 S.Ct. 1636, 1644, 137 L.Ed.2d 945 (1997) ("But we have never suggested that the President, _or any other official,_ has an immunity that extends beyond the scope of any action taken in an official capacity.") (emphasis added); _Nixon v. Fitzgerald,_ 457 U.S. 731, 759, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (Burger, C.J., concurring) ("Moreover, a President, like Members of Congress, judges, prosecutors, or congressional aides-all having absolute immunity-are not immune for acts outside official duties."); _Nixon,_ 457 U.S. at 766 (White, J., dissenting) ("A prosecutor who directs that an investigation be carried out in a way that is patently illegal is not immune."). When prosecutors are engaged in administrative or investigatory activities within the scope of their official duties, they are only

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 357336 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

qualifiedly immune from liability. *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); *Pinaud,* 52 F.3d at 1147 (citing *Day,* 909 F.2d at 77; *Imbler,* 424 U.S. at 410).

**\*4** While it is true that Mollen is entitled to summary judgment as to the malicious prosecution claim based upon absolute immunity, Mollen would not be immune if the prosecution was conducted in a racially discriminatory manner, rendering his acts beyond the scope of his official duties. Additionally, Mollen is not absolutely immune insofar as plaintiff's claims center upon investigatory or administrative activities. Therefore, to the extent that absolute immunity does not attach, the Court will address each claim in turn.

**2. Malicious Prosecution under** 42 U.S.C. § 1983.

Though plaintiff's malicious prosecution claim is a federal claim for violation of his Fourth Amendment right to be free from unreasonable seizures, *see Albright v. Oliver,* 510 U.S. 266, 274-75, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 116 (2d Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996), the elements of this cause of action are otherwise identical to a state law malicious prosecution claim. *See Cook v. Sheldon,* 41 F.3d 73, 79 (2d Cir.1994); *Raysor v. Port Auth. of New York and New Jersey,* 768 F.2d 34, 39 (2d Cir.1985), *cert. denied,* 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986). Under New York State law, the elements of a malicious prosecution claim are: (1) the commencement or continuation of a criminal proceeding by defendants against plaintiff, (2) the termination of that proceeding in favor of the plaintiff, (3) the absence of probable cause for the criminal proceeding, and (4) actual malice. *See Colon v. City of New York,* 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983); *Pomento v. City of Rome,* 231 A.D.2d 875, 647 N.Y.S.2d 604, 605 (4th Dep't 1996); *Janendo v. Town of New Paltz Police Dep't,* 211 A.D.2d 894, 621 N.Y.S.2d 175, 177 (3d Dep't 1995). Here, plaintiff pleaded guilty to two counts of felony assault. "As a general rule, a person who pleads guilty to, or who has been convicted after trial of, the crime for which he was arrested is barred from recovering damages pursuant to a § 1983 action based upon either a claim for malicious prosecution or a claim of false arrest." *Williams v. Markel,* 1993

WL 489203, at \*5 (N.D.N.Y.) (citing *Cameron v. Fogarty,* 806 F.2d 380, 386-87 (2d Cir.1986); *Ford v. New York City Transit Auth.,* 1992 WL 175664, at \*2-3 (E.D.N.Y.); *Keyes,* 594 F.Supp. 1147, 1155 (N.D.N.Y.1984)). The only exception to this rule arises when a plaintiff can demonstrate that his plea was invalid. *Williams,* 1993 WL 498203, at \*5. Here, plaintiff has pleaded guilty and does not contend that his plea was invalid. Accordingly, Mollen is entitled to summary judgment in this respect on plaintiff's malicious prosecution claim.

**3. False Imprisonment under** 42 U.S.C. § 1983.

Like a federal claim for malicious prosecution, "a § 1983 claim for false arrest or false imprisonment is barred by a plea of guilty ." *Keyes,* 594 F.Supp. at 1155 (citing *Griffen v. City of Mount Vernon,* 553 F.Supp. 1047, 1049 (S.D.N.Y.1983); *Pouncy v. Ryan,* 396 F.Supp. 126, 127 (D.Conn.1975); 22 N.Y. Jur. *False Imprisonment* § 48). Again, plaintiff pleaded guilty to two counts of felony assault, and his section 1983 false imprisonment claim is barred because of that plea. Mollen's motion for summary judgment on the claim of false imprisonment is therefore granted.

**4. Equal Protection of the Law under** 42 U.S.C. § 1983.

**\*5** Courts have recognized section 1983 equal protection claims based upon discriminatory failures by public officials to conduct proper investigations. *See, e.g., Haydon v. Grayson,* 134 F.3d 449 (1st Cir.1998) (recognizing claim brought against town and police chief for failure to investigate allegations of sexual abuse; denied for failure to show discriminatory intent based on sex). Although there is no constitutional right to an investigation *per se,* public officials, including law enforcement, may not "selectively deny ... protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago County Dep't. of Social Services,* 489 U.S. 189, 197 n. 3, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). As such, it would not be permissible for the County District Attorney to investigate allegations of misconduct brought by white individuals while not investigating similar allegations brought by black individuals solely because of the race of the complainant. However, for plaintiff to properly state

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1998 WL 357336 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

a race-based equal protection claim, he must show that Mollen acted with "purposeful discrimination." *Washington v. Davis,* 426 U.S. 229, 243-44, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Soto v. Flores,* 103 F.3d 1056, 1067 (1st Cir.), *cert. denied,*522 U.S. 819, 118 S.Ct. 71, 139 L.Ed.2d 32 (1997) (sex-based equal protection claim). Therefore, plaintiff must show that Mollen was motivated, at least in part, by a discriminatory purpose. *Personnel Administrator v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). A discriminatory purpose will be found where "the decisionmaker .... selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."*Id.* at 279.

Here, plaintiff has offered no evidence to support the conclusory allegation that Mollen acted with a discriminatory purpose. Plaintiff has not produced, for example, any evidence regarding similar investigations involving white complainants. Thus, there is no basis upon which a reasonable fact finder could conclude that Mollen treated plaintiff differently because of his race. As such, plaintiff has failed to make the evidentiary showing necessary to survive a motion for summary judgment as to this claim. Summary judgment is therefore granted as to plaintiff's <u>section 1983</u> equal protection claim.

5. Equal Benefit of the Law under <u>42 U.S.C. § 1981</u>.

<u>Section 1981(a) of Title 42 of the United States Code</u> states:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, *and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens,* and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

<u>42 U.S.C. § 1981(a)</u> (emphasis added). Plaintiff's <u>section 1981</u> claim is similar to his <u>section 1983</u> equal protection claim. Plaintiff seems to argue that Mollen engaged in an investigation that was tainted with racial animus and discriminatory intent.

***6** Broadly speaking, "[s]ection 1981 has been construed as a prohibition against racial

discrimination."*Yusaf v. Vassar College,* 827 F.Supp. 952, 955 (S.D.N.Y.) (citing *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 608-10, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)), *aff'd in part, rev'd in part on other grounds,*35 F.3d 709 (1994)."However, to fall within the purview of <u>§ 1981</u>, a defendant's action must have been intentionally and purposefully discriminatory, and the plaintiff's race must have been the motivating factor behind the defendant's discriminatory acts."*Astrada v. Howard,* 979 F.Supp. 90, 94 (D.Conn.1997) (citing *Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988))."Moreover, it is clear 'that under <u>§ 1981</u>, the events of the intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor for defendant's action must be specifically pleaded in the complaint ...." ' *Id.*(quoting *Yusuf, 827 F.Supp. at 955).* "[N]aked assertion[s] by plaintiff that race was a motivating factor without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's race [are] too conclusory ...." *Yusuf, 827 F.Supp. at 955-56.*

Again, plaintiff merely asserts that Mollen engaged in a racially discriminatory investigation. Plaintiff offers no evidence that the reason Mollen failed to investigate certain allegations or interview additional potential witnesses was due to the fact that plaintiff was black. In the course of Mollen's investigation, he gathered and reviewed: 1) all police reports and civilian witness statements in possession of the BPD; 2) an Internal Affairs Report prepared by a BPD Captain; 3) photographs of police officers Zikuski, Talbut, and Heslin, as well as photos of plaintiff and the other two men arrested that night; 4) copies of 911 and police communication tapes; 5) the medical observation and history sheets of the plaintiff and the two other arrestees relating to their medical condition the morning after their arrest; 6) the medical records of the individuals taken to the hospital the night of the incident; and 7) over 11 personal interviews.<sup>FN5</sup>(4/6/98 Stone Aff. Ex 1.) Plaintiff fails to show how these activities, or any omissions as to these activities by the District Attorney's office, add up to a racially tainted investigation.

> FN5. The District Attorney Investigation Report indicates that personal interviews were conducted with four police officers: Dennis Gorman, Terrance Heslin, Joseph Zikuski, and Michael Talbut. In addition,

Not Reported in F.Supp.                                                            Page 6
Not Reported in F.Supp., 1998 WL 357336 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

personal interviews were conducted with Kevin Giblin (the bar patron who confronted plaintiff's daughter and friends outside the bar), Miguel Colon (plaintiff's neighbor at the time whose door was also broken down that night as was assaulted by a civilian), Stuart Apsey (the civilian who assaulted Colon and who later pleaded guilty to trespass for that action), Cindy Weathers (acquaintance of off-duty police officers present that night), Charlotte Onishea (friend of plaintiff's daughter who witnessed events both out on the street and inside the apartment that night), Herbert Bernhauer (plaintiff's neighbor at the time), and several members of the Lourdes Hospital emergency room staff who provided treatment that night. The Report states that attempts were made to interview plaintiff's daughter, but that she refused.

Plaintiff also fails to plead or show any specific acts that would tend to show racial animus by Mollen. There are no allegations that Mollen used racial slurs, that in similar circumstances a white person received a more thorough investigation or a more lenient plea agreement, or that Mollen somehow deviated from office policies or practices because of the color of plaintiff's skin. In short, there is simply no factual support for the allegation that Mollen's conduct in this investigation was racially motivated. For these reasons, summary judgment on the section 1981 claim is granted.

C. Pendent State Claims

**\*7** Plaintiff in his Memorandum of Law in Opposition to Defendant Mollen's Motion for Summary Judgment indicates that he does not intend to seek compensation on any state claims. (Pl. Mem. of Law in Opp'n to Def.'s Mot. for Summ. J., 5). Therefore, this Court dismisses all pendent state claims against Mollen.

III. CONCLUSION:

For all the foregoing reasons, it is hereby

ORDERED, that Mollen's motion for summary judgment dismissing the claims under 42 U.S.C. §§ 1981 and 1983 against him is GRANTED. It is

further

ORDERED, that the pendent state claims for assault, battery, false imprisonment, negligence and gross negligence, to the extent brought against Mollen, are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,1998.
Daniels v. City of Binghamton
Not Reported in F.Supp., 1998 WL 357336 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d                                                                                                     Page 1
Not Reported in F.Supp.2d, 2005 WL 2436219 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

C Friedman v. New York City Admin. for Children's
Services
E.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Steven FRIEDMAN, Plaintiff,
v.
NEW YORK CITY ADMINISTRATION FOR
CHILDREN'S SERVICES; Daniel Cohen; Saint
Vincent Catholic Medical Centers; Barney Masnick;
Jennifer Masnick; Helene Friedman; Marco
Cardenas; Patrice McFarlan-Wooden; Sonia Ricketts-
Hubbard and Zilma Costanza, Defendants.
**No. 04-CV-3077(ERK).**

Sept. 30, 2005.

Eli Feit, Stuart A. Blander, Heller, Horowitz & Feit,
P.C., New York, NY, for Plaintiff.
Kimberly Conway, New York City Law Department,
Barry Glenn Saretsky, Saretsky Katz Dranoff &
Glass LLP, New York, NY, Alan Hirschhorn, Jaspan,
Schlesinger Hoffman, L.L.P., Garden City, NY,
James M. Murphy, Montfort, Healy, Mcguire &
Salley, for Defendants.

*MEMORANDUM AND ORDER*

KORMAN, J.
*1 Defendant Dr. Daniel Cohen ("Dr.Cohen") moves
to dismiss all plaintiff's claims against him. In
February of this year, I granted the motion to dismiss
filed by another defendant, St. Vincent Catholic
Medical Center ("St.Vincent").*SeeFriedman v. NYC
Admin. For Children's Servs.,*No. 04-CV-3077
(E.D.N.Y. Feb. 25, 2005) ("February 25th Order").

Plaintiff brought this action against the New York
City Administration for Children's Services ("ACS"),
several employees of that institution, various in-laws,
and Dr. Cohen, the boyfriend of plaintiff's estranged
wife's sister. Plaintiff seeks damages for the
defendants' "wrongful and malicious deprivation of
plaintiff's parental rights through the commencement
of an utterly baseless 'neglect proceeding' which all
but terminated plaintiff's visitation and contact with
his three minor children for over seven

months."Amended Complaint ¶ 1 ("Complaint").
Plaintiff asserts claims for the violation of 42 U.S.C.
§ 1983, the "wrongful termination of parental rights,"
abuse of process, defamation, and malicious
prosecution. Because I conclude that plaintiff has
advanced sufficient allegations to state a viable claim
under § 1983, I deny Dr. Cohen's motion to dismiss
as to that cause of action. Because discovery will
proceed accordingly on that claim, and because all of
plaintiff's other claims arise out of the same facts, I
find it unnecessary at this stage of the litigation to
resolve Dr. Cohen's arguments as to the remaining
claims.

*Background*

The facts of this troubling case are set forth in detail
in the February 25th Order, but I reiterate the
background here. Steven Friedman ("plaintiff") is the
father of three children-Jacob, Rachel and Benjamin-
with his estranged wife Helene Friedman ("Helene"),
one of the defendants. Among the other defendants
are Barney Masnick ("Barney"), Helene Friedman's
father, Jennifer Masnick ("Jennifer"), Helene's sister;
and Dr. Cohen, who was dating Jennifer during the
events which gave rise to this action. The remaining
defendants are ACS and four ACS employees
(collectively "the ACS defendants"): (1) Marco
Cardenas ("Cardenas"), a caseworker; (2) Patrice
McFarlan-Wooden ("McFarlan-Wooden"), a
supervisor; (3) Sonia Ricketts-Hubbard ("Ricketts-
Hubbard"), a manager; and (4) Zilma Costanza
("Costanza"), a supervisor. Plaintiff claims that he
was injured after Dr. Cohen filed false and malicious
reports of child abuse and neglect with ACS,
precipitating an investigation and the temporary
curtailment of plaintiff's visitation rights. Dr. Cohen
is a psychiatrist licensed to practice medicine in the
State of New York, specializing in child and
adolescent psychiatry. Complaint ¶ 9. At the time he
filed the reports of abuse and neglect, Dr. Cohen was
employed as a resident physician by St. Vincent.
Complaint ¶ 10.

Plaintiff asserts that after he and Helene began living
apart in 2002, they became embroiled in a bitterly
contested matrimonial and child custody dispute. The
dispute was the subject of a matrimonial action in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2005 WL 2436219 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Supreme Court of New York, Queens County, which was pending at the time plaintiff filed this action. Pursuant to an order entered in the matrimonial action, formal custody of plaintiff's children was temporarily granted to Helene, but plaintiff was awarded liberal visitation rights with his children. Plaintiff took advantage of these rights by seeing his children days, nights, and weekends, and speaking with them by phone daily.

**\*2** On or about July 24, 2003, Dr. Cohen contacted ACS by phone, identifying himself as a psychiatrist at St. Vincent. In an oral report ("ORT"), Dr. Cohen informed ACS that plaintiff was abusing and neglecting his children, and, as a result, ACS opened a case file on plaintiff and his children. Dr. Cohen subsequently reiterated the accusations against plaintiff in written reports to ACS dated July 31, 2003 and August 10, 2003 ("Reports"). In the Reports, Dr. Cohen stated that in his professional opinion, plaintiff's contact with his children was harming them, and that "the children seem to suffer from symptoms of an adjustment disorder with mixed anxiety and depressed mood."Complaint ¶ 21. In addition, Dr. Cohen's Reports stated the following: (1) "I have observed the children to be frightened and tearful following visits with their father;" (2) "The children ... appeared to be traumatized after a visit with their father;" (3) Plaintiff "seems willing to use the children as pawns and expose them to all of his malevolent plans;" (4) "The children are experiencing traumatic emotion effect by crying hysterically, shaking, and being completely terrified to be with their father;" (5) "The children are at risk [and] if the situation continues, it can have a devastating long-term emotional and psychological effect;" and (6) Plaintiff's "intentions do not appear to be in the best interest of the children."Complaint ¶ 67.

Plaintiff asserts that Dr. Cohen filed the ORT and Reports with ACS even though he knew the allegations they contained were without any factual basis. Complaint ¶ 27. Plaintiff contends that the false and malicious reports were filed as part of a scheme in which Dr. Cohen sought to curry favor with his girlfriend Jennifer (plaintiff's estranged wife's sister) by providing Helene with leverage in the matrimonial action and depriving plaintiff of his visitation rights. According to plaintiff, Dr. Cohen contacted ACS "at the urging and insistence, and

with the knowledge, authorization and approval of, defendants Helene, Jennifer, and Barney," all of who sought to help Helene and undermine plaintiff in the matrimonial action. *Id.* Plaintiff maintains that Dr. Cohen never examined the children in his clinical capacity; rather, the only contact Dr. Cohen had with the children took place in the presence of Barney, Helene, and Jennifer, usually at Barney's home. Dr. Cohen never observed the children interacting with plaintiff, nor did he ever speak to plaintiff about his relationship with his children. Notably, Dr. Cohen never revealed to ACS that he was romantically involved with the sister of plaintiff's estranged wife, and when questioned by ACS, Helene denied that Dr. Cohen and Jennifer were dating.

After filing the Reports with ACS, Dr. Cohen referred the children to a colleague at St. Vincent, Dr. Lubit, who observed Jacob in a clinical capacity at least twice. Plaintiff avers that Dr. Lubit concluded that the allegations Dr. Cohen had made concerning plaintiff were unfounded. Nonetheless, neither Dr. Lubit nor any other employee of St. Vincent contacted ACS to correct the inaccurate information Dr. Cohen had reported.

**\*3** Plaintiff alleges that after ACS received Dr. Cohen's Reports, the agency failed to investigate the accusations thoroughly and was reckless and grossly negligent in conducting its investigation. He contends that between July 2003, when Dr. Cohen first contacted ACS, and September 2003, the ACS defendants failed to investigate the allegations against plaintiff with due diligence and in a neutral and unbiased manner, in disregard of ACS's own rules and procedures. According to plaintiff, caseworker Cardenas acted recklessly and with gross negligence, as did his supervisors. ACS did not contact any personnel at the children's school nor did the agency speak with the forensic psychologist appointed by the court in the matrimonial action, Dr. Robert Kassoff, who had recommended that plaintiff have unsupervised contact with his children. ACS never observed plaintiff interacting with his children. Nevertheless, in September 2003, ACS instituted a neglect and abuse proceeding against plaintiff ("the Neglect Proceeding").

In the Neglect Proceeding, acting upon a petition prepared by Cardenas and approved by McFarlan-Wooden and Ricketts-Hubbard, ACS obtained a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2436219 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

temporary order of protection ("the Termination Order") which limited plaintiff's contact with his children by directing: "FATHER TO HAVE NO CONTACT WITH THE SUBJECT CHILDREN EXCEPT AGENCY SUPERVISED VISITATION UNTIL FURTHER ORDER OF COURT."Complaint ¶ 32. According to plaintiff, language used in the petition to initiate the Neglect Proceeding was lifted verbatim from the Reports filed by Dr. Cohen. Although plaintiff's liberal visitation rights before the Neglect Proceeding allowed him unsupervised visits on days, nights, and weekends, after the Termination Order was issued, plaintiff was limited to two hours of visitation with his children each week in the offices of ACS.

From November 2003 to January 2004, a trial was held on the accusations of abuse and neglect. At the trial caseworker Cardenas admitted that, although the petition with which he initiated the Neglect Proceeding described the children as "shaking" and being terrified in plaintiff's presence, he had never seen such behavior. Complaint ¶ 67. After the trial, in a decision and order dated April 19, 2004 ("Supreme Court Order"), the court rejected all of the accusations of abuse and neglect against plaintiff, and dismissed the abuse and neglect proceedings, restoring plaintiff's visitation rights with his children. The court concluded that ACS "failed to provide any credible proof that the children have suffered an impairment or are at imminent risk of suffering an impairment of their emotional condition as a result of the actions or inactions of the respondent father."Complaint ¶ 5. The court specifically rejected the "finding [of abuse] by Dr. Cohen [in his Reports] not only on the basis of his obvious bias in the matter but also on the grounds that it is admittedly not based on a professional diagnosis or personal observation of his."Complaint ¶ 37.

*4 Although the Supreme Court Order substantially restored plaintiff's parental rights in April 2004, plaintiff alleges that the approximate seven-month suspension of his parental rights violated his fundamental familial rights and caused him severe emotional damage. He also avers that the public airing of the accusations against him caused him severe shame and embarrassment and damaged his reputation within the community.

Plaintiff initiated this action by filing a timely Notice of Claim upon New York City and ACS on June 21, 2004. Plaintiff's Amended Complaint, filed on August 31, 2004 asserts the following five causes of action: (1) a claim pursuant to 42 U.S.C. ¶ 1983, alleging that defendant violated plaintiff's constitutional right to visit and interact with his children; (2) a claim that defendant violated plaintiff's "right under state law to visit and interact with his children;" (3) abuse of process; (4) defamation; and (5) malicious prosecution. Plaintiff demands compensatory damages of $10,000,000.00, punitive damages in the same amount, and attorney's fees.

Before me is Dr. Cohen's 12(b)(6) motion to dismiss. None of the other defendants have joined this motion.

*Discussion*

In his motion, Dr. Cohen asserts that plaintiff's § 1983 claim fails as a matter of law because the Second Circuit has repeatedly held that a parent's substantive due process rights are not violated when the state exercises its authority to temporarily separate parent and child for the purpose of investigating allegations of child abuse. Dr. Cohen asserts, in the alternative, that plaintiff's section 1983 claim fails because Dr. Cohen is a private actor, and plaintiff cannot establish that Dr. Cohen acted "under color" of law. Dr. Cohen also claims that each of the state law causes of action should be dismissed, both because Dr. Cohen is protected by statutory and common law privileges, and because his claims are substantively insufficient as a matter of law.

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must show (1) a deprivation of a constitutional right (2) "under color of any statute, ordinance, regulation, custom or usage, of any state or Territory."42 U.S.C. § 1983. Dr. Cohen argues that plaintiff's § 1983 claim should be dismissed both because plaintiff has failed to plead a constitutional injury and because he cannot show that Dr. Cohen acted "under color" of law.

Turning first to the constitutional injury requirement, plaintiff alleges that Dr. Cohen "knowingly and deliberately instigated a meritless ACS investigation of plaintiff for the purpose of causing ACS (based on deliberately false information) to interfere with plaintiff's relationship with his children."Plaintiff's Memorandum at 13. The essence of plaintiff's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2436219 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

argument appears to be that Dr. Cohen and the other defendants conspired to infringe his substantive due process right to family integrity. It is "clearly established that a parent's interest in the custody of a child [is] a constitutionally protected liberty interest subject to due process protection."*Cecere v. City of New York,* 967 F.2d 826, 829 (2d Cir.1992); *see also Wilkinson v. Russell,* 182 F.3d 89, 103-04 (2d Cir.1999) ("A parent's interest in the custody of a child is a constitutionally protected liberty interest."); *Chi v. Rivera,* 48 F.Supp.2d 335, 348 (S.D.N.Y.1999) (reiterating that there is a "liberty interest in family integrity ... under the Fourteenth Amendment"). Indeed, the "right to the preservation of family integrity encompasses the reciprocal rights of both parent and children. It is the interest of the parent in the 'companionship, care, custody and management of his or her children,' and of the children in not being dislocated from the 'emotional attachments that derive from the intimacy of daily association with the parent.' " *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977) (quoting *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14, (1977)). Moreover, "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents...." *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

**\*5** However, "[w]hile the Supreme Court has recognized an abstract fundamental liberty interest in 'family integrity,' the Court has never found that interest to be absolute or unqualified."*Watterson v. Page,* 987 F.2d 1, 8 (1st Cir.1993). This is true, in part, because the right to family integrity "is counterbalanced by the 'compelling governmental interest in the protection of minor children, particularly in circumstances where their protection is considered necessary as against the parents themselves.' " *Wilkinson,* 182 F.3d at 104 (quoting *Manzano v. South Dakota Dep't of Social Servs.,* 60 F.3d 505, 510 (8th Cir.1995)). Thus, "the right to family integrity clearly does not include a constitutional right to be free from child abuse investigations." *Watterson,* 987 F.2d at 8.

Because neither the abstract right to family integrity nor a parent's interest in the custody of his or her

child is absolute, averred constitutional violations must be assessed on a case-by-case basis, examining the specific allegations in question. Specifically, in conducting such an examination, the Second Circuit has assessed whether a parent's rights are violated by balancing the circumstances surrounding the suspension of parental rights with the extent and duration of the suspension. *See, e.g., Nicholson v. Scoppetta,* 344 F.3d 154, 172 (2d Cir.2003) (finding no substantive due process violation by child welfare authorities where children were removed from their homes for brief periods, where the purpose of removals was to ensure children's safety during investigations of domestic abuse).*Tenenbaum v. Williams,* upon which Dr. Cohen relies, is entirely consistent with this analysis. There, based on various signs of sexual abuse, child welfare workers removed the plaintiffs' daughter from school and subjected her to a medical evaluation, removing her from her parents' control for a period of several hours. 193 F.3d 581, 592 (2d Cir.1999). The *Tenenbaum* Court held that there was no basis "to hold that a temporary separation of [the child] from her parents in an effort to obtain assurance that she had not been abused would have been so shocking, arbitrary and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection."*Id.* at 600.The Second Circuit rejected the plaintiff's invitation to analogize to cases which held that even brief seizures violated the Fourth Amendment, suggesting that the constitutionality of actions which separated children and parents could not be assessed without examining the surrounding circumstances and the reasons given for interferences with family integrity. *See id.* at 601 ("It does not follow from the principle that brief seizures of people may be unreasonable and therefore violate the Fourth Amendment that brief removals of children from their parents *to protect them from abuse* are 'without any reasonable justification in the service of a legitimate governmental objective,' under the Due Process Clause."(quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

**\*6** Based, in part, on *Tenenbaum,* Dr. Cohen suggests that, regardless of the circumstances that lead to a temporary suspension of parental rights, and regardless of the duration of that suspension, no substantive due process violation can be found unless the interference causes a "wholesale relinquishment" of the right to raise a child. Dr. Cohen's position,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2436219 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

however, stretches the relevant precedent. Indeed, the forced "wholesale relinquishment" of a parent's right to raise his children may *not* amount to a violation of that parent's constitutional rights if, in fact, that parent's abuse of his child precipitated the removal. Conversely, the separation of parent and child, even if of a significantly short duration, might constitute a constitutional violation if undertaken for entirely arbitrary or wholly malicious purposes.

The assessment whether plaintiff here has adequately pled a violation of his substantive due process rights must entail an examination of the extent of interference with parental rights alongside the alleged justification for the interference. Prior to Dr. Cohen's contacts with ACS, plaintiff spent weekends, Jewish holidays and evenings with his children on a regular basis. He enjoyed daily telephone contact with his children, and developed an extremely close relationship with Jacob, Rachel, and Benjamin. *See* Complaint ¶ 20. Following Dr. Cohen's malicious and false reports to ACS, plaintiff was able to visit with his children for only two hours a week, in the offices of ACS, under agency supervision. For a period of approximately seven months, therefore, plaintiff was unable to maintain a close relationship with his children, as he had done before the Neglect Proceeding was initiated based on Dr. Cohen's false accusations. This substantial interference with plaintiff's parental rights was a result not of credible and alarming signs of abuse, as in *Nicholson* or *Tenenbaum,* but was caused by the intentionally false accusations of Dr. Cohen that lacked any real basis in fact. Under such circumstances, where the unfounded allegations of an admittedly biased accuser provide the sole cause for the suspension of a parent's rights, the lack of any legitimate reason for the interference with family integrity weighs strongly in favor of finding a constitutional violation.

Nevertheless, even if plaintiff has adequately alleged a constitutional injury, his § 1983 claim cannot succeed unless he can also show that Dr. Cohen acted "under color" of state law. *SeeBriscoe v. LaHue,* 460 U.S. 325, 329-30, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). Although private actors acting alone do not satisfy Section 1983's state action requirement, private parties may be liable under Section 1983 if they act in concert with state officials. *SeeAdickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Determining whether a private party's actions are sufficiently connected with those of state officials to deem the private party's actions "under color" of law is an imprecise science, and the Supreme Court has identified multiple tests for evaluating state action. Private actors may be found to act "under color" of law under at least four tests: (1) the "symbiotic relationship" test, *seeBurton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); (2) the "public function" test, *see,e.g.,Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); (3) the "close nexus" test, *seeJackson v. Metro., Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); and (4) the "joint participation" test, *seeAdickes,* 398 U.S. at 152. Under the circumstances of this case, it is appropriate to analyze whether Dr. Cohen acted "under color" of law under the last theory, the joint participation test.

*7 In *Adickes,* the Supreme Court set out the parameters of the joint participation test as follows: [A] private party ... even though not an official of the State, can be liable under s 1983. "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willing participant in joint activity with the State or its agents," '

*Adickes,* 398 U.S. at 152 (quoting *United States v. Price,* 383 U.S. at 794 (1966)). Applying this theory in *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), the Supreme Court held that private parties who corruptly conspired with a judge, a state actor, acted "under color" of state law. *Seeid.* at 27-28 ("[T]o act 'under color of' state law for Section 1983 purposes does not require that the defendant be an officer of the state. It is enough that he is a willing participant in joint action with the state or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of Section 1983 actions.").

The Supreme Court also applied the joint participation test in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 941-42, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), in which the Court held that a corporate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2436219 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

creditor acted "under color" of law when it invoked the aid of state officials to use state-created attachment procedures to deprive the plaintiff of his property. *See id.* at 942 ("The Court of Appeals erred in holding that in this context 'joint participation' required something more than invoking the aid of state officials to take advantage of state-created attachment procedures."). While *Lugar* arose in the context of prejudgment attachments of property, there is a stronger basis for extending the holding of a case where a defendant deliberately and wrongfully caused a violation of the plaintiff's constitutional rights. Specifically, in the context of a criminal prosecution under 18 U.S.C. § 1951, it has been held that a private actor may be found guilty of extortion under color of official right. The basis for this holding is "the precept that an individual with the requisite criminal intent may be held liable as a principal if he is a cause in fact in the commission of a crime, notwithstanding that the proscribed conduct is achieved through the actions of innocent intermediaries."*United States v. Margiotta,* 688 F.2d 108, 131 (2d Cir.1982). The same reasoning would apply to a prosecution under the federal civil rights laws, *see e.g. United States v. Lester,* 363 F.2d 68, 72 (8th Cir.1966), and there is no logical reason why it should not apply in the context of a civil action.

While the criminal cases discussed above turn on the language of 18 U.S.C. § 2(b), which provides that a defendant is responsible as a principal for causing another to commit an offense for which the defendant could not have otherwise been guilty as a principal, the "doctrine [underlining § 2(b) ] is an outgrowth of common law principles of criminal responsibility dating at least as far back as *Regina v. Saunders,* 2 Plowd. 473 (1575); and of principles of civil responsibility established, by force of the maxim *qui facit per alium facit per se,* at least as early as the 14th century. (*See: United v. Gooding,* 25 U.S. (12 Wheat.) 460, 6 L.Ed. 693 (1827); Sayre, *Criminal Responsibility for the Acts of Another,* 43 Harv.L.Rev.689) (1930).)"*United States v. Lester,* 363 F.2d at 72.

*8 Indeed, a defendant who causes an unlawful arrest or prosecution may be held responsible civilly if he does so by maliciously providing false information. *See* 59 N.Y.Jur.2d *False Imprisonment,* § 58 at 320; *William L. Prosser, HandBook of the Law of Torts,* § 11, p. 47 and note 97 (7th ed.1971); *Rosario v.*

*Amalgamated Lines,* 605 F.2d 1228, 1248 (2d Cir.1979); *see also Palmer v. Monroe County Deputy Sheriff,* 2004 WL 941784, *5 (W.D.N.Y.2004)* (denying defendant's motion for summary judgment on plaintiff's malicious prosecution claim where defendant provided inaccurate and incomplete information to grand jury, leasing to plaintiff's prosecution); *Fowler v. Robinson,* 1996 WL 67994 (N.D.N.Y.1996) (collecting cases holding that defendant who causes arrest or prosecution by making accusations to police satisfies malicious prosecution requirement or initiating judicial action).

Particularly apposite here is *Coakley v. Jaffe,* 49 F.Supp.2d 615 (S.D.N.Y.1999), a case in which private actors manipulated the evidence they presented to a county assistant district attorney, leading to the arrest and prosecution of the plaintiffs. Judge Rakoff rejected the private defendants' argument that the plaintiffs had failed to plead actions taken "under color" of law, stating:

[The private actors] also argue that the § 1983 false arrest claims against them should [be] dismissed because their actions were not taken under color of law. However, "[p]rivate persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 [claims]," even if the state actor himself is immune from liability. Here, the plaintiffs allege that [the private actors] wilfully caused defendant Driscoll, an Assistant District Attorney, to violate plaintiffs' rights by manipulating the evidence presented to the Grand Jury. Drawing every reasonable inference in favor of the plaintiffs, the Court concludes that plaintiffs have, at least for present purposes, sufficiently pled the existence of joint action that warrants treating [the private actors] as state actors for purposes of assessing plaintiffs' federal false arrest claim.

*Id.* at 624.

Just as the private defendants in *Coakley* presented manipulated evidence to the assistant district attorney, leading to a violation of the plaintiffs' constitutional rights, Dr. Cohen provided ACS with false and malicious information, leading to the curtailment of plaintiff's substantive due process rights. As plaintiff asserts:

[Dr.] Cohen ... induced and participated in the 'Neglect Proceeding' and the procurement of the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2436219 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

Termination Order by the ACS Defendants and jointly engaged in and willfully collaborated in the deprivation of plaintiff's federal constitutional rights.

Complaint ¶ 45. Again, assuming the allegations of the complaint to be true, Dr. Cohen was a willing participant in the scheme which set in motion by his false oral and written reports to ACS and caused the initiation of the Neglect Proceeding that resulted in the suspension of plaintiff's parental rights over the course of more than half a year. In order to curry favor with Jennifer and Helene, Dr. Cohen invoked the aid of the ACS defendants to deny plaintiff his substantive due process rights to family integrity by using state-created procedures for the investigation of child abuse. Accordingly, I conclude that, at least on this motion to dismiss, plaintiff has sufficiently pled the joint participation of Dr. Cohen and the ACS defendants to justify treating Dr. Cohen as a state actor, and to find that his actions were taken "under color" of law.

*9 Because I conclude that plaintiff has adequately pled a constitutional injury, and that Dr. Cohen, as a joint participant with the ACS defendants, acted "under color" of law, I deny Dr. Cohen's motion to dismiss plaintiff's § 1983 claim. This leaves open the question whether plaintiff's state law claims are sufficient to survive Dr. Cohen's motion, but it is unnecessary to explore these issues at any length. Plaintiff's § 1983 claim, which arises from the same factual predicate which has given rise to his state law claims, must be tried in any event. If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted. As observed by Judge Clark in an analogous context: "[T]here seems no question that in the long run fragmentary disposal of what is essentially one matter is unfortunate not merely for the waste of time and expense caused the parties and the courts, but because of the mischance of differing dispositions of what is essentially a single controlling issue.*Audi Vision Inc. v. RCA Mfg. Co.,* 136 F.2d 621, 625 (2d Cir.1943).

*Conclusion*

Dr. Cohen's motion to dismiss plaintiff's § 1983

claim is denied. I also deny the motion as to plaintiff's remaining claims without prejudice.

SO ORDERED.

E.D.N.Y.,2005.
Friedman v. New York City Admin. for Children's Services
Not Reported in F.Supp.2d, 2005 WL 2436219 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT E**

Page 1 - Superintendent Daniel Kehoe, Complaint No. 01-93-1123

OCR DOCKET NO.:     01-93-1123.RES
LOF ISSUE DATE:     MAY 19, 1994
NAME OF SIGNER:     THOMAS J. HIBINO

May 19, 1994

Mr. Daniel Kehoe
Superintendent
Millis Public Schools
245 Plain Street
Millis, Massachusetts 02054

                              Re: Complaint No. 01-93-1123

Dear Superintendent Kehoe:

The Office for Civil Rights ("OCR") has completed its
investigation of the above-referenced complaint, which was filed
against Millis Public Schools (the "District") on April 29, 1993.
The Complainants alleged that the District subjected a number
female students to discrimination on the basis of sex by failing
to respond effectively to their concerns regarding sexual
harassment, and by treating them differently than a male student
in the provision of home tutoring and in sports participation.

This case was investigated under Title IX of the Education
Amendments of 1972, as amended, 20 U.S.C. Section 1681 et seq.,
and its implementing regulation found at 34 C.F.R. Part 106
("Title IX") which prohibit discrimination on the basis of sex in
any program or activity receiving or benefiting from Federal
financial assistance.   The District is in receipt of such
assistance and is, therefore, subject to the provisions of Title
IX.

Based on its investigation of these issues, OCR has determined
that the District was in violation of Title IX with respect to
the Complainants' allegations.   The bases for our determination
are set forth below.

Legal Standards

Title IX prohibits sex discrimination in programs and activities
operated by a recipient of Federal financial assistance.   Both
OCR and the courts recognize sexual harassment as unlawful sex
discrimination prohibited by Title IX.   The form of unlawful
sexual harassment which is at issue in this case is "hostile
environment" harassment, where unwelcome conduct has the purpose
or effect of unreasonably interfering with a person's right or

benefit (such as education) by creating an intimidating, hostile or offensive environment.

To find that a hostile environment exists, OCR must find that the alleged victims were subjected to verbal or physical conduct imposed because of the victim's gender, that the conduct was unwelcome, and that the conduct was sufficiently severe, persistent or pervasive as to alter the conditions of the victims' education and create an abusive environment.

An educational institution will be considered to have adequately responded to a situation of student-to-student harassment if it conducts a thorough and objective investigation, takes immediate actions to fully remediate any harm that occurred, and takes steps reasonably calculated to prevent sexual harassment from occurring in the future.

Also, under 34 C.F.R. Section 106.8(b) a recipient must adopt and publish a grievance procedure for the prompt and equitable resolution of complaints of sexual harassment.

Allegations

The Complainants are six female students who were enrolled at Millis High School during the 1992-93 school year, and their parents. The Complainants allege that all six of the students were victims of sexual harassment by the same male student ("Student A"), and that the District did not take appropriate steps to investigate and stop the sexual harassment. Another concern of the Complainants is that after the alleged sexual harassment occurred, Student A was given home tutoring, but the victims were not immediately offered the same opportunity for home tutoring. The Complainants further allege that Student A was allowed to continue to participate in sports after the harassment was reported to the District, but the female victims were not given the same opportunity to play sports.

More specifically, the students made the following allegations:

   - Student 1 claimed that during the 1991-92 school year, Student A would repeatedly grab her breasts and rear end. In May or June, 1992, Student A grabbed her as she entered a classroom, pulled her on to his lap and put his hand between her legs, and talked to her about having sex with him. Student 1 ran out of the building and into the car of a friend. Student A followed her and stared at her through the window. Student 1 reported this incident to the School Principal, who, according to Student 1, did not offer her any assistance or comfort.

Page 3 - Superintendent Daniel Kehoe, Complaint No. 01-93-1123

- Student 2 claimed that Student A harassed her from January 1992 through June, 1992, and then began again in the fall of the following school year. The harassment consisted of hitting her on the legs, grabbing her wrists, touching her breasts, and comments soliciting sexual contact. Student 2 reported to OCR that she complained to the guidance counselor in October, 1992. Student 2's mother reported to OCR that the matter was not investigated, and that the complaining students were ostracized by their peers. She also reported that while her daughter was testifying in the criminal proceeding against Student A, all of Student A's teammates from the school football team entered the courtroom and intimidated her. This incident took place during school hours.

- Student 3 claimed that Student A harassed her by touching and hitting her, picking her up over his head, making comments to her of a sexual nature, spreading rumors about her, and writing on her pants. Student 3 reported to OCR that when she complained to the Principal, in October, 1992, he told her that there was nothing he could do, and that she should deal with this on her own time.

- Student 4 claimed that Student A harassed her by blocking her way, putting his hands on her, grabbing her and holding her against her will. Student 4 also reported that after the students complained to the School Principal about the harassment, they were ostracized by other students.

- Student 5 claimed that she was raped by Student A off school grounds. Student 5 reported to OCR that after she told the guidance counselor about these incidents she was harassed by other students, including the members of the football team who left school to attend court during the criminal proceedings against Student A.

- Student 6 claimed that Student A harassed her by grabbing and touching her breasts and rear end. This behavior continued throughout the time that Student A attended the school, from November, 1992, until the complaints were filed in October, 1993.

In addition to the six above-numbered students who filed complaints with OCR, the actions of five other students, including Students 7, 8, and 9, are discussed below.

Findings of Fact

OCR investigated this complaint by reviewing documents submitted by the District and the complainants, and by interviewing the complainants and School personnel including the superintendent,

Principal, Title IX Coordinator, guidance counselors and several faculty members. After conducting its investigations, OCR makes the following findings.

In June, 1992, Student 1 reported to the School Principal that Student A was harassing her. The Principal did not make any record of the filing of the complaint, and did not tell Student 1 what he intended to do about it. The Principal has reported to OCR that he spoke to Student A following the receipt of the complaint, and warned him that further incidents would result in disciplinary action. Student 1 has stated that Student A did not further harass her following this incident.

On October 28, 1992, Students 1 and 4 accompanied Student 7 to the Principal's office. Student 4 was told to wait outside the office, and Students 1 and 7 spoke to the Principal. Student 7 told the Principal that Student A had harassed her on an almost daily basis by approaching her from behind, pinning her arms down and rubbing her breasts, resulting in bruises on her arms, chest and breasts. Student 1 stated that she was there to support Student 7, but that she had not experienced any harassment since June, 1992.

Later in the morning of October 28, 1992, Student 1 returned to the Principal's office with Student 3. Student 3 reported allegations of harassment against Student A, as stated above. Students 2, 8 and 9 also met with the Principal. Student 2 reported allegations, as stated above. Student 8 reported that Student A had attempted to rape her on two occasions, in the gym and near the boy's locker room. Student 9 reported that Student A had verbally harassed her, and had grabbed her and punched her in the arm. At the Principal's request, the guidance counselor sat in on all of these meetings. Student 5 met with the guidance counselor alone, to report allegations of harassment, as stated above. The Principal and guidance counselor told the students that they would speak to Student A, that they should tell their parents to call the Principal, and that as the school could not file criminal charges, they should talk to their parents about filing criminal charges against Student A.

At approximately 2:30 p.m. on October 28, 1992, 11 students, including students 1 - 9, went to the Millis Police Station to file sexual assault charges against Student A. Shortly after this event, the Principal called the police station to state that Student A was in his office, and would like to know what to expect. The police advised Student A not to speak with any student who he believed might have made a complaint against him, and not to act in a way that might be interpreted as threatening or intimidating towards a female student. The Principal advised

Page 5 - Superintendent Daniel Kehoe, Complaint No. 01-93-1123

the police that he had just issued a similar verbal and written warning to Student A.  The written warning consisted of a letter documenting the allegations made by Students 1 and 7 (and identifying them by name), and stating, in part that

> "Based on sufficient statements from staff and students, including my own observations in which you have 'wrapped your arms around girls' in school, I am ordering you to cease and desist from any physical contact with any student in this school.  Should it be reported and confirmed that you have had physical contact of any kind on any student in this school, you shall be suspended immediately until the next school committee meeting at which time a hearing will be held to determine your future at Millis High School." .

On November 18, 1992, Student A was arrested. At his arraignment, the judge issued a verbal order to Student A requiring him to stay away from the alleged victims.  To enable to Student A to meet the requirements of the order, the school offered him two options: (1) to be accompanied by an aide all times that he was on school grounds in order to ensure that there was no contact between Student A and the victims, or (2) to be home tutored, but continue to participate in school athletics.  With the advice of his attorney, Student A chose option (2), and began receiving home tutoring.   Student A continued to participate in school athletics and other extracurricular activities, including acting as captain of the football and basketball teams, and attendance at the senior prom.

Immediately following the receipt of the complaints on October 28, 1992, the Principal interviewed four teachers who had been named by the complainants as possible witnesses to some of the reported incidents of harassment.  None of these teachers could offer any information corroborating the allegations.  In addition to interviewing these teachers, the District attempted to obtain information from the police department and the district attorney's office.  These attempts were not successful, and, on November 20, 1992, the Principal notified the police department that, as they were not able to receive any information concerning the criminal investigation, the District would be conducting its own investigation by attempting to speak with the alleged victims and their parents.  On November 24, 1992, the guidance counselor sent a memo to the Principal stating that she had contacted the parents of five of the complaining students, and told them that unless their daughters waived their right to confidentiality, no school investigation could take place.  According to the memo, the guidance counselor further stated that she had explained to the parents that if the school were to pursue an investigation, Student A would have to be informed of the identities of the

accusers, all students involved would have to be interviewed by the Principal and another member of the school administration, and a closed session hearing before the school committee might take place. According to the memo, all of the parents then stated that they did not want the school to conduct an investigation at this time. In the absence of permission to reveal all of the victims' identities to Student A, the School did not conduct any further investigation into the allegations.

On November 19, 1992, the day after Student A's arrest, the Principal met with each School grade level at separate assemblies. At these assemblies, the Principal explained the criminal justice system, assured the students that the school intended to protect the rights of all involved individuals, and warned students to remain neutral, pending the outcome of the criminal proceeding. The Principal also sent a letter expressing similar sentiments to all parents on November 20, 1992.

Despite these warnings, the student body became very emotionally involved in the incident, with many students taking sides. According to teachers, administrators and complainants, the issue polarized the school. Many students supported Student A, who had been very popular and a star athlete. These students objected to the filing of charges and openly questioned the integrity and moral character of the female student complainants. The complainants therefore felt that they continued to be subjected to a sexually hostile environment because of the action they had taken.

The complainants have told OCR that they repeatedly requested assistance from the School to help the complaining students feel safe and supported. The complainants claim that despite their requests, no services were offered to them during the three months following the filing of their complaints. Because they believed that they had received little or no assistance from the school, the parents formed a group and met with the superintendent in late January, 1993. Then, at a second meeting held one week later, the superintendent gave the parents a memo dated February 1, 1993 which listed the services that the students were purportedly already receiving. These services included individual and group counseling the school guidance counselor, in-school and after school tutoring, and special consideration from teachers concerning deadlines, homework, and exams. According to the parents, some of these services may have been offered at some point to some of the students, but they were not systematically offered to all of the complaining students until February, 1993. According to the District, beginning on November 2, 1992, all of the students received individual counseling on at least a daily basis, several participated in a

weekly support group, and all were offered tutoring and the other above-listed accommodations.

In February, 1993, Students 1, 3 and 5 requested home tutoring. The School has informed OCR that it inquired of the state Department of Education as to whether it could honor these requests, and was told that tutoring could be provided only under the state regulations concerning special education home/hospital tutoring. Pursuant to these regulations, the school required that the students provide a note from a medical doctor explaining their inability to attend school, and prohibited the students from participating in athletic and extracurricular activities while being home tutored.

None of the six complaining students returned to Millis High School in September, 1993. Student 1 continues to be home tutored. Student 2 began the school year at a different school, and returned to Millis High School during the school year. Students 3 and 6 are enrolled at other high schools. Student 4 dropped out of school and received a GED. Student 5 moved to Florida with her family.

At the time that the female students approached the Principal to raise allegations of sexual harassment against the male student, the District did not have in place a sexual harassment policy or grievance procedure. In November, 1992, the superintendent formed a Sexual Harassment Task Force. The Task Force organized a one day in-service training for all school personnel on sexual harassment, led by Nan Stein, Director of the Wellesley College Center for Research on Women, which was held on February 10, 1993. The Task Force developed procedures for reporting sexual harassment in November, 1992, and a sexual harassment policy in January, 1993. The Policy was officially adopted by the School Committee on May 4, 1993. The Task Force also distributed a questionnaire on sexual harassment to all members of the Millis community.

The complainants filed their complaint with OCR on April 29, 1993. Students 1 and 3 and their parents also filed individual complaints with the Massachusetts Department of Education ("MDOE") on April 13, 1993. MDOE issued its report and findings on October 28, 1993. The report concluded that the allegation of inequitable treatment was not substantiated, but that the District's lack of formal, written grievance procedures and a policy on sexual harassment hindered the resolution of the complaint and contributed to a perception of inequitable treatment based on gender.

In January and February, 1994, the School principal published

notices concerning the MDOE report in a newsletter which is issued to the entire community. In the notices, the principal mentions only that part of the report which concluded that the allegation of inequitable treatment was not substantiated, and states that the report "confirms what the school has been saying since the beginning of this case, and that is that the school acted responsibly and fairly." The principal's notice ends with a statement that "Unfortunately, the notoriety associated with the case and the aggressive posture taken by some associated with the case may have thrown some doubts on that fact."

Analysis

During its investigation, OCR interviewed the complaining students and their parents, several faculty members, including guidance counselors and teachers, and representatives of the administration, including the Director of Pupil Personnel Services, the School Principal and the Superintendent. All of those interviewed by OCR, including District personnel, either supported or did not dispute the allegations of sexual harassment made by the students. Accordingly, OCR found that Students 1 - 6 were sexually harassed by Student A, who verbally and physically assaulted them for nearly one year. OCR found that the harassment was so persistent and pervasive that it created a hostile environment that altered the Students' educational environment and interfered with their ability to benefit from their education.

OCR further found that, although the District took some actions in response to reports of harassment, it failed to take sufficient action to end the conduct early on. Beginning at least as early as June, 1992, the District knew or should have known about the sexual harassment. In June, 1992, Student 1 complained to the School principal about Student A. Student 1 claims that on that occasion she reported the same allegations she later told to OCR, as described above. The Principal has told OCR that he does not recall exactly what Student 1 told him. He does recall, however, that he spoke to Student A following the receipt of the complaint, and warned him to cease his harassing behavior. No further action was taken at that time.

On October 28, 1992, the School was made aware of several additional incidents of harassment. OCR found that on that date, the District did respond to the reports of harassment, but failed to take sufficient action to resolve the situation. On that date, the Principal gave Student A a letter documenting the allegations made by Student 1 and 7, and stating that he had sufficient supporting evidence, including his own observations of

Student A's behavior, to direct him to cease and desist from any physical contact with other students. The letter further stated that Student A would be suspended immediately if it was reported and confirmed that he had had any further physical contact with any student. The Principal did later hear of further incidents involving Student A, including rape and attempted rape. The fact that these incidents had already occurred does not justify the failure to take any further disciplinary action against Student A.

OCR has found that the District failed to conduct an independent investigation into this matter. The District has informed OCR that it did not undertake any investigation for two reasons. First, the District initially believed that it should obtain information through the district attorney's office and the police department, and not interfere with the criminal process be doing its own independent investigation. Second, the District maintains that after learning that law enforcement officials were not willing to share information, the District attempted to launch their own investigation, but were unable to because several of the students would not allow their names to be revealed to Student A. OCR found that neither of these reasons are sufficient to justify the District's failure to conduct an investigation.

Although the criminal process involved related issues, they were not at all identical to the matters that the District needed to resolve. The District had an obligation to enact a grievance procedure which would result in prompt and equitable resolution of the sexual harassment complaints, regardless of any criminal process. The refusal of some students to allow the District to reveal their names to Student A does not excuse the District from its obligation to investigate and resolve the matter. In the absence of the students' agreement to waive their confidentiality, the District still had many options available. For example, the students could have been interviewed by the guidance counselor, who also could have questioned witnesses identified by the students. Also, Student A could have been questioned about his actions, without reference to specific individuals. Moreover, Student A was aware of the identities of two of his accusers through the letter given to him by the School principal on October 28, 1992, and could have been asked specific questions related to those students.

Because the District did not conduct an investigation and issue findings concerning the students' allegations, the matter continued to be unresolved for the remainder of the school year. A thorough investigation of the matter and the issuance of a strong public finding concerning the allegations of harassment

Page 10 - Superintendent Daniel Kehoe, Complaint No. 01-93-1123

would have helped to reach a prompt resolution of the situation.

Another measure which would have facilitated a prompt and equitable resolution of the matter is the immediate offering of support services to all of the complaining students. The District's provision of services to the complaining students stands in marked contrast to its treatment of Student A. When the District learned that a judge had ordered Student A to stay away from the alleged victims, it facilitated Student A's compliance with the Order by immediately offering him two reasonable alternatives, and allowing him to choose the option that best met his needs, in consultation with his attorney. One of these options was to provide him with home tutoring while allowing him to participate in extracurricular activities. In contrast, although some services were offered to some of the students, the District did not make a systematic attempt to meet the needs of all students involved until February, 1993, after the parents complained repeatedly to the Superintendent about the matter. When home tutoring was requested by some complainants they were obliged to secure medical documentation of their inability to attend school, which also had the effect of prohibiting them from participating in extracurricular activities. Moreover, although in-school counseling was offered to the students for some period of time, in February, 1993, the guidance counselor informed the students that she had been subpoenaed to testify in the criminal proceeding. Although the School successfully moved to quash the subpoena, the students knew that there was a chance that she might have to testify in a subsequent proceeding. According to the guidance counselor, after this the girls believed that it was not safe to talk to her, and the counseling tapered off.

Additionally, the school failed to implement any crisis intervention measures that would have served to address the concerns of the entire school community. The only official communication received by the students were the assemblies held on the day following Student A's arrest. At these assemblies, the Principal provided the students with useful information concerning the criminal justice system and the rights of the accused, and issued an important warning about the danger of taking sides in such matters. The students were not, however, given any real information about sexual harassment, any sensitivity training concerning the situation of the victims, or any opportunity to engage in an appropriately facilitated dialogue to air their feelings. As a result, despite the principal's warning, many students acted in a way that made the complaining students feel ostracized and humiliated. An example of this was the intimidating behavior of the football team at the court proceedings concerning Student A. Because of lack of

training and preparation, some of the faculty, too, were not
equipped to handle the situation, and made comments that the
complaining students perceived as hurtful and insensitive. For
example, one teacher reported to OCR that he commented to his
class that "no good would come out of this [i.e. the filing of
criminal charges]." He further reported that this remark seemed
to upset one of the complaining students, as she responded by
saying that one good thing that might come out of this would be
if Student A were to be punished for his crimes.

OCR found that because the District failed to implement a prompt
and equitable resolution of the matter, tensions between the
complaining students and their families, and the School
community, continued to escalate. As late as April, 22, 1993,
two of the complaining students were accosted off school grounds
by the senior class president, who insulted them using sexually
explicit language, and threatened them with physical violence.
OCR found that there also continues to be tension between the
complainants and the District administration. This tension is
evident in the notices published by the School principal in the
community newsletter as recently as January and February, 1994,
in which he failed to mention any of the negative findings
contained in the MDOE report, and accused the complainants of
unduly aggressive behavior. These notices certainly contribute
to the complaining students' perception that the School believes
they are blameworthy and not welcome at school.

The prompt and equitable resolution of this matter was clearly
impeded by the District's lack of a sexual harassment policy or
procedure. According to the District, plans had already been
made for the development of such a policy before the complaints
were filed, in October, 1992. The District did develop its
policy during AY 1992-93, and these were implemented in May 1992.
However, although the sexual harassment policy and procedure has
been in effect since May, 1993, OCR found that the school
community is still currently not sufficiently familiar with their
content. Some of the faculty members interviewed by OCR
believed that they were given copies of the policy at a faculty
meeting; others believed it was distributed to them in their
mailboxes. Some thought the policy had been discussed at a
faculty meeting; others could not recall any discussion. Many of
the interviewed faculty did not seem to be clear about the steps
involved in the grievance procedure. For example, one teacher
believed that complaints should be referred to the District's
Title IX Coordinator, and not the guidance counselor, as
specified in the policy. As to the students, OCR learned that
the policy is included in the Student Handbook, which is
distributed to all students at grade level assemblies conducted
by the principal on the first day of school. The policy was

mentioned at these assemblies, along with all other new additions
to the handbook.  In addition, freshmen received a more extensive
three or four sessions orientation, during which the policy is
also explained.

During the course of its investigation, OCR reviewed the
District's current sexual harassment policy.  OCR found that the
policy was commendable in many respects, including its definition
of sexual harassment, and its inclusion of standards of conduct.
OCR also found, however, that the "Procedure" section of the
policy did not set forth with sufficient detail the steps
involved in an investigation, and the alternatives available to
complainants who do not wish to identify themselves to their
harasser, or to write a letter to the alleged harasser.  The
District has agreed to revise its policy to address these issues,
as well as other more minor matters identified by OCR.

Conclusion

OCR concluded that the complaining students were subjected to
hostile environment sexual harassment by another student in the
School, based on their gender, and that the conduct was
unwelcome.  OCR concluded that the conduct against the students
was sufficiently persistent and pervasive to interfere with their
opportunity to benefit from an education.  OCR also concluded
that the District was put on notice of a possible problem in
June, 1992, and knew of the harassment in October, 1992.  By not
taking sufficient prompt and effective action to investigate the
allegations, discipline the harasser, and address the concerns of
the entire school community, the District failed to adequately
address the situation.  OCR also found that the District had not
adopted or implemented a policy or grievance procedure for the
prompt and equitable resolution of complaints of sexual
harassment.  Accordingly, OCR finds that the District subjected
the students to discrimination on the basis of their sex in
violation of Title IX.

At the conclusion of its investigation, OCR initiated
negotiations with the District.  As a result of these
negotiations, the District signed a Compliance Agreement
("Agreement") on May 5, 1994 to remedy the violations.  The
Agreement includes actions intended to remedy both individual and
systemic matters (copy attached).  Based on the District's
written assurance that the remedial actions set forth in the
Agreement will be completed by the dates specified in the
Agreement, OCR considers the District to be currently fulfilling
its obligations under Title IX.

If you have any questions, please feel free to contact me or

Page 13 - Superintendent Daniel Kehoe, Complaint No. 01-93-1123


Emily Lichtenstein, Investigator, at (617) 223-9685.

                    Sincerely,


                    Thomas J. Hibino
                    Regional Director

Enclosure

01931123.LLA

Compliance Agreement
Millis Public School District
Complaint No. 01-93-1123


To resolve the above-referenced complaint and ensure that the Millis School District ("The District") is in compliance with Title IX of the Education Amendments of 1972 and its implementing regulations, the District agrees to take the following actions. It is understood that this Agreement does not constitute and admission by the District of any violation of Title IX or any other law, and nothing in this document should be construed as an admission of non-compliance or liability under any applicable state or federal laws.

1) Within 30 days of signing this Agreement, the District shall submit to OCR for its review a revised draft of its Sexual Harassment Policy for Students. The submitted draft shall include the following revisions:

(A) The Procedure section shall include a provision requiring any faculty member who receives a complaint concerning sexual harassment or observes conduct which he or she believes may constitute sexual harassment to report the complaint to the Title IX Coordinator, who shall keep a written record documenting the names of the persons involved, the date that the complaint was received, a summary of the allegations, and a summary of the resolution of the complaint.

(B) The Procedure section shall clearly set forth the steps involved in an investigation, including the production of a written investigation report with documented findings;

(C) The Procedure section shall include the identity of the staff person(s) who are to be involved in each aspect of the procedures, and specific time frames shall be attached to each step of the procedures;

(D) an alternate procedure shall be provided for those complainants who do not wish to identify themselves toe the alleged harasser, for those who submit a verbal complaint only, and for those who choose not to write a letter to the alleged harasser;

(E) a procedure for appeal shall be provided.  The appeal procedure shalt include the identity of the person or entity who will hear appeals, the duties and obligations of the participants, and specific time frames for the performance of each step of the procedure;

(f) paragraph 2 of the section entitled" General Guidelines" shall be clarified to provide that the procedure may be invoked even if other appeal and adjudication procedures have been provided by state law or other policies;

2)  Within 30 days of signing this Agreement, the District shall designate an additional staff person to duties the Title IX Coordinator in the performance of her duties pursuant to Title A, and shall submit to OCR in writing a description of those duties that will be delegated to the additional staff person, and those that will be retained be the title IX Coordinator.

3)  The District shall continue to conduct an annual written survey of faculty and Students concerning sexual harassment, and shall use the results of the survey to develop appropriate follow-up activities and responses.

4)  Within 30 days of signing this agreement, the District shall submit to OCR for review a summary of all training and education provided to all employees, students and parents concerning sexual harassment, gender equity issues, and the implementation of a sexual harassment policy, during the period from September 1992 through the present.  The submitted summary shall include the specific content area covered by such training, the dale(s) that such training took place, the participants, and the person(s) who conducted the training.

5)  Within 60 days of signing this Agreement, the District shall submit to OCR for review a summary of all projected training and education to be provided to all employees, students and parents concerning sexual harassment, training equity issues, and the implementation of a sexual harassment policy, during the 1994-95 and 1995-96 school years.  Such training and education shall include, but not be limited to, guidance on the implementation of the District's current sexual harassment policy, a curriculum concerning sexual harassment to be taught at the middle school and high school levels, and small group sessions on sexual harassment for administrators, faculty and staff and students.

6)  The District shall include parents in the process of planning and participating in training and other activities related to sexual harassment.  Such inclusion efforts shall include the solicitation of input from the School Councils and

the Health Advisory Council.

7)   After reviewing the information submitted in response to paragraph (5), above, OCR may recommend additional training activities which the District shall implement.

8)   For two years following the date of signing of the Agreement, OCR shall monitor the District to determine whether the District has implemented a revised sexual harassment policy, and training and educational activities in compliance with this Agreement.  The monitoring activities conduced by OCR shall include review of documents related to all training sessions, including copies of curricula, and feedback or follow-up materials, and review of the results of the District's annual survey concerning sexual harassment.

9)   Within 10 days of signing this Agreement, the District shall provide to OCR for its review and approval a letter containing the following information:

     (A)  A statement to the students, which shall include language such as: "Millis understands that this has been a difficult process for you, and we are willing to offer you the following services:"

     (B)  An offer to fund psychological counseling not to exceed a maximum of 20 sessions at the rate set by the Massachusetts Rate Setting Commission for 45 minute individual counseling sessions.  Within 30 days of receipt of the offer, each student shall notify the District in writing whether they accept or reject the offer.  Also, each student shall notify the district in writing the name of the professional providing the services.  The services will be concluded within one year  of the date of the offer.

     (C)  An offer to fund a summer school course or courses taken during the summer of 1994 only.  These courses must be offered through a state approved public school or community college summer program, at a rate not to exceed $255/course, and not to exceed two courses.  Within 30 days of the receipt of the offer, each student shall notify the District in writing whether they accept or reject the offer.  Each student accepting the offer shall notify the District in writing of the specific summer school program and course(s).

10)  Within 10 days following OCR's approval letter, the District shall provide copies of the letter to xxxxxx, xxxxxx, xxxxxxx, xxxxxxx, xxxxxxxx, xxxxxxxx, and xxxxxxxxxxx.

11)  In the next community wide issue of the "Mohawk Messages" published following the date of the signing of this Agreement, the District shall include a statement (1) explaining that sexual harassment allegations received by the District shall be handled promptly and equitably, pursuant to current District policy and procedures; (2) providing information about the policy and procedures, including where copies can be obtained; (3) identifying and providing the address and business telephone number of the District's Title IX Coordinator(s).


_____
Daniel K. Kehoe
Millis Public Schools District


Date: _____ May 05, 1994 _____